# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Conghua Yan,
v.
Plaintiff-Appellant

The State Bar of Texas, a private company; The Barrows Firm, a private company; Leslie Starr Barrows, in Individual Capacity, as Member of the State Bar of Texas; William Albert Pigg, in Individual Capacity, as Member of the State Bar of Texas; Samantha Ybarra, in Individual Capacity, as Member of the State Bar of Texas; Luis Jesus Marin, in Individual Capacity, as Member of the State Bar of Texas, and Official Capacity as Assistant Disciplinary Counsel for the Office of the CDC; Daniel Eulalio Martinez, in Individual Capacity, as Member of the State Bar of Texas, and Official Capacity as Assistant Disciplinary Counsel for the Office of the CDC; Rachel Ann Craig, in Individual Capacity, as Member of the State Bar of Texas, and Official Capacity as Assistant Disciplinary Counsel for the Office of the CDC; Lori L. DeAngelis, in Individual Capacity, as member of the State Bar of Texas and Official Capacity as Associate Judge; Tarrant County; U.S. Bank,

Defendants-Appellees

On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division Civil Action No. 4:23-CV-00758-Y, The Hon. Terry R. Means, Presiding

## OPENING BRIEF OF APPELLANT

Respectfully submitted:

Conghua Yan
2140 E Southlake Blvd, Suite L-439
Southlake, Texas 76092
214-228-1886
[arnold200@gmail.com](mailto:arnold200@gmail.com)
Pro Se Appellant

<u>Certificate of Interested Persons</u>

Appellant certifies that the following listed persons and entities as described in the fourth sentence of *Rule 28.2.1* have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1)     **Plaintiff-Appellant:** Conghua Yan

2)     **Defendants-Appellees:** State Bar of Texas; Barrows Firm; Leslie Starr Barrows; William Albert Pigg; Samantha Ybarra; Luis Jesus Marin; Daniel Eulalio Martinez; Rachel Ann Craig; Lori L. DeAngelis; Tarrant County; U.S. Bank.

3)     **Counsel for Defendants-Appellees:** Amanda Marie Kates; Michael G. Graham; Royce A. Lemoine; Katherine Elizabeth Owens; Melvin Keith Ogle; Caroline Cyrier; Jon-William Nathaniel James; Roland K. Johnson; Melissa Hill; Tyler James Hill; William Albert Pigg.

*/s/ Conghua Yan*
Conghua Yan, Pro Se Appellant

2

## Statement Regarding Oral Argument

Yan requests oral argument because this appeal presents recurring issues of federal jurisdiction, ERISA preemption, immunity, abstention, amendment, sanctions, and civil RICO.

# Table of Contents

Certificate of Interested Persons ............................................................................................2

Statement Regarding Oral Argument ......................................................................................3

Table of Contents ....................................................................................................................4

**Table of Authorities**............................................................................................................7

    Cases ...................................................................................................................................7

    Statutes...............................................................................................................................8

    Rules ..................................................................................................................................9

    Other Authorities..............................................................................................................9

Jurisdictional Statement .......................................................................................................10

Introduction...........................................................................................................................11

Issues Presented ...................................................................................................................20

    I.     Global Reversible Errors (Issues 1–9) ....................................................................20

        A.     ERISA controls the alleged non-QDRO transfer ..................................................20

        B.     *Younger* abstention does not apply...................................................................21

        C.     The district court answered a different case........................................................21

        D.     Premature foreclosure of amendment and merits review.....................................21

    II.    Defendant-Specific Errors (Issues 10–16) .............................................................22

        A.     Sherman Act § 2 substitution .............................................................................22

        B.     DeAngelis ..........................................................................................................23

        C.     SBTX Defendants ..............................................................................................24

        D.     Barrows-Ybarra and Pigg....................................................................................25

        E.     RICO theory substitution ...................................................................................26

        F.     U.S. Bank ..........................................................................................................26

    III.    Sanctions, Access, and Reassignment (Issues 17–19) ............................................27

        A.     Sanctions and access restrictions .......................................................................27

Statement of the Case............................................................................................................29

    A.     The district court dismissed the federal case Yan actually pleaded before factual clarification or meaningful amendment........................................................................................29

    Table 1: Summary of Defendant Dismissals in the District Court Proceedings ....................36

B.    After remand, Yan promptly sought reconsideration, supplementation, and amendment, but the court again shut every corrective path ...................................................................................... 37

C.    The court then compounded the merits errors by sanctioning issue-preserving conduct and restricting further access to review ................................................................................................ 39

Statement of Facts.................................................................................................................................. 40

Table 2: Documented Factual Core................................................................................................... 46

Summary of the Argument...................................................................................................................... 47

Standard of Review................................................................................................................................. 52

Argument and Authorities...................................................................................................................... 53

I. The district court dismissed a substituted case, not Yan's ERISA case; this global error independently requires vacatur. .................................................................................................................................. 53

A. The threshold rulings rest on a substituted premise because ERISA, not domestic-relations labeling, controls the alleged non-QDRO transfer of retirement assets to attorney-fee claimants (Issues 1–2). .............................................................................................................................................. 54

B. *Younger* abstention cannot stand because the district court skipped *Sprint*'s gatekeeping step, dismissed with prejudice instead of deferring, and ignored ERISA's preemptive federal remedial path (Issues 3-4)................................................................................................................................... 69

C. The Rule 12 dismissal cannot stand because the district court answered a materially different case by recasting ERISA diversion as a domestic-relations grievance and substituting unbriefed theories for Yan's pleaded § 664 and § 2 claims (Issue 5). ...................................................................... 73

Table 3: Substituted Theories Decided by the District Court................................................................ 74

Table 4: Record-Based Examples of Premise Substitution ................................................................... 78

D. The court terminated this case prematurely because it imposed an unauthorized amendment restriction, dismissed with prejudice without identifying dispositive deficiencies, denied reconsideration without a governing standard, and denied Rule 15(a)(2) leave on the wrong pleading (Issues 6–9). ......................................................................................................................... 79

II. The defendant-specific dismissals repeat the same premise substitution and add defendant-specific legal errors. ........................................................................................................................................... 85

A. The antitrust dismissal cannot stand because the district court replaced Yan's pleaded Sherman Act § 2 consumer-monopoly claim with an unbriefed § 1-type market-competition theory and, as to SBTX, entered a sua sponte Rule 12(b)(6) dismissal after rejecting SBTX's Rule 12(b)(1) immunity challenge (Issue 10)................................................................................................................................ 86

B. The DeAngelis dismissal cannot stand because the district court applied judicial-immunity and no-adversity doctrines in bulk to conduct alleged to fall outside Chapter 9 authority, outside ERISA's QDRO exception, and outside ordinary domestic-relations adjudication because criminal-case fee debt was allegedly routed through a fabricated "spousal support" label, without the function-by-function analysis federal law requires (Issue 11 and sub-issues 11(a)–11(d)). ................................................. 89

C. The SBTX and disciplinary-defendant dismissals cannot stand because Yan was not a disciplinary respondent, did not seek review of any disciplinary judgment, and pleaded later bar conduct as post-

notice shielding of an ERISA-fund diversion—not grievance dissatisfaction (Issue 12 and sub-issues 12(a)–12(c)). ...................................................................................................................................95

D. The Barrows-Ybarra and Pigg dismissals cannot stand because the complaint pleaded altered-order and coordinated diversion conduct beyond ordinary advocacy, and Pigg's post-remand dismissal reused prior reasoning without Pigg-specific merits review (Issues 13–14 and sub-issues 13(a)–13(c)). ...................................................................................................................................98

E. The RICO dismissals and RICO futility ruling cannot stand because the district court treated Yan's § 664 predicate as a standalone criminal claim, replaced Yan's ERISA-pension-fund-diversion predicate theory with an unbriefed § 1956 money-laundering framework, applied the wrong § 1962(d) standard, and then denied leave without testing the materially more specific RICO allegations in Doc. 210-1. (Issue 15 and sub-issues 15(a)-15(c)). ...............................................................................105

F. The U.S. Bank dismissal cannot stand because the complaint pleaded notice, U.S. Bank's acknowledged conflict between controlling orders, and a subsequent ERISA-fund distribution—not a routine ministerial transaction (Issue 16 and sub-issues 16(a)–16(c)). ...........................................110

III. The sanctions ruling and pre-filing injunction must be vacated, and remand should be assigned to a different judge. ....................................................................................................................................115

A. The pre-filing injunction and related sanctions must be vacated because the court treated permissible filings as abuse and imposed a *sua sponte* litigation restriction without the process *Qureshi* requires (Issues 17–18 and sub-issues 17(a)–17(b)) ...........................................................115

B. Reassignment is required under *In re Corrugated Container Antitrust Litig.* because the post-recusal reassignment did not produce the de novo Article III review § 636(b)(1) requires, and fresh review would impose no meaningful duplication cost. (Issue 19). ..............................................................117

Conclusion .................................................................................................................................118

CERTIFICATE OF SERVICE ....................................................................................................119

CERTIFICATE OF COMPLIANCE............................................................................................119

APPELLANT'S APPENDIX........................................................................................................120

# Table of Authorities

## Cases

*ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518 (5th Cir. 2013) .......................................................... 71

*Ankenbrandt v. Richards*, 504 U.S. 689 (1992) ......................................................... 61

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) ......................................................... 85

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......................................................... 36, 82, 86

*Ballard v. Wilson*, 856 F.2d 1568 (5th Cir. 1988).......................................................... 71

*Bauer v. Texas*, 341 F.3d 352 (5th Cir. 2003) ......................................................... 23, 36, 89–90

*Bazrowx v. Scott*, 136 F.3d 1053 (5th Cir. 1998).......................................................... 80

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................ 36, 101

*Bellinsky v. Galan*, No. 24-1351, 2025 WL 2047809 (10th Cir. July 22, 2025) (unpublished) ........... 18, 69

*Bishop v. State Bar of Tex.*, 791 F.2d 435 (5th Cir. 1986) ......................................................... 94

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ......................................................... 85

*Boggs v. Boggs*, 520 U.S. 833 (1997) ......................................................... 12

*Cornish v. Corr. Servs. Corp.*, 402 F.3d 545 (5th Cir. 2005)........................................................ 101

*Covington v. Humphries*, No. 24-1158, 2025 WL 1448661 (10th Cir. May 19, 2025) (unpublished)........ 69

*Creekside Rural Invs., Inc. v. Hicks*, 644 S.W.3d 896 (Tex. App.—Eastland 2022, no pet.) ..................... 70

*Dalton v. Dalton*, 551 S.W.3d 126 (Tex. 2018)......................................................... 59, 72, 88

*Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023) (en banc)......................................................... 69

*Deakins v. Monaghan*, 484 U.S. 193 (1988) ......................................................... 48, 71

*Dennis v. Sparks*, 449 U.S. 24 (1980) ......................................................... 101

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975)......................................................... 72

*Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307 (5th Cir. 2014) ......................................................... 86

*Doe v. Dynamic Physical Therapy, LLC*, No. 25-180 (U.S. Dec. 8, 2025) (per curiam) ..................... 18, 95

*E-Sys., Inc. v. Pogue*, 929 F.2d 1100 (5th Cir. 1991) ......................................................... 66, 68, 71

*Ex parte Young*, 209 U.S. 123 (1908) ......................................................... 24–25, 73, 94–95

*Forrester v. White*, 484 U.S. 219 (1988) ......................................................... 49, 88, 91, 93

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305 (5th Cir. 2002) ....................... 83

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ......................................................... 66

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)......................................................... 16

*Haywood v. Drown*, 556 U.S. 729 (2009) ......................................................... 24, 94, 98

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ......................................................... 59

*Holloway v. Walker*, 765 F.2d 517 (5th Cir. 1985) ......................................................... 36, 90

*Howlett v. Rose*, 496 U.S. 356 (1990) ......................................................... 24, 94, 98

*In re Corrugated Container Antitrust Litig.*, 614 F.2d 958 (5th Cir. 1980) ................................ 28, 52, 114

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285 (2009).............................108, 110–111

*Krempp v. Dobbs*, 775 F.2d 1319 (5th Cir. 1985) ......................................................... 94

*Lewis v. Beddingfield*, 20 F.3d 123 (5th Cir. 1994)......................................................... 71

*Liedtke v. State Bar of Tex.*, 18 F.3d 315 (5th Cir. 1994) ......................................................... 94

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982)......................................................... 25, 27, 101

*Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453 (3d Cir. 2019) ......................................................... 69

*Marshall v. Marshall*, 547 U.S. 293 (2006) ......................................................... 62

*McKinley v. Abbott*, 643 F.3d 403 (5th Cir. 2011)......................................................... 13, 48, 87, 89, 115

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982).................... 48, 68–69, 72

*Mireles v. Waco*, 502 U.S. 9 (1991)......................................................... 93

*Miroth v. County of Trinity*, 136 F.4th 1141 (9th Cir. 2025) ................................................................ 18

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...................................................... 18–19, 56

*Morrison v. Morrison*, 729 S.W.3d 328 (Tex. 2026) .................................................. 18, 72, 88

*Mylett v. Jeane*, 879 F.2d 1272 (5th Cir. 1989) ............................................................... 101

*Nesses v. Shepard*, 68 F.3d 1003 (7th Cir. 1995) ............................................................... 68

*NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024) ................................... 18–19, 56

*Ogbebor v. Hardy*, No. 24-30403 (5th Cir. Feb. 24, 2025) (unpublished) ................................. 83

*PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267 (Tex. 2012) ...................................................... 59

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ............................................... 48, 71

*Qureshi v. United States*, 600 F.3d 523 (5th Cir. 2010) ........................................ 51–52, 113–114

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .................................................................. 85

*Riascos v. U.S. Marshals Serv.*, 76 F.3d 93 (5th Cir. 1996) ................................................. 83

*Roach v. Ingram*, 557 S.W.3d 203 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ................... 70

*Salinas v. United States*, 522 U.S. 52 (1997) ..................................... 26, 50, 99, 106–107

*Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356 (2006) ............................................... 67

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ............................................................. 54

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ..................... 21, 48, 52, 68–70, 72, 95

*Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010) ............................................ 83

*Stump v. Sparkman*, 435 U.S. 349 (1978) ................................................................... 49, 88

*Taylor v. Tolbert*, 644 S.W.3d 637 (Tex. 2022) ....................................................... 24, 95, 97

*Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495 (5th Cir. 2021) ............................................. 69

*TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230 (3d Cir. 2022) ....................................... 69

*United States v. Bailey*, 115 F.3d 1222 (5th Cir. 1997) ..................................................... 64

*United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978) ............................... 26, 50, 106–107

*United States v. Sineneng-Smith*, 590 U.S. 371 (2020) ...................................................... 86

*Williams v. Reed*, 604 U.S. 168 (2025) ...................................................... 18, 24, 95, 98

*Wyatt v. Cole*, 504 U.S. 158 (1992) ............................................................................. 25

*Youngkin v. Hines*, 546 S.W.3d 675 (Tex. 2018) ............................................................... 96

## Statutes

15 U.S.C. § 2 ........................................................................................................... 29

15 U.S.C. §§ 15(a), 26 ................................................................................................ 72

18 U.S.C. § 1027 ............................................................................................... 74, 103

18 U.S.C. § 1341 .......................................................................................... 29, 74, 103

18 U.S.C. § 1343 .......................................................................................... 29, 74, 103

18 U.S.C. § 1349 ............................................................................................... 74, 103

18 U.S.C. § 1956 ............................... 17, 21, 26, 47, 50, 54, 73, 75, 77, 84, 103, 105, 107

18 U.S.C. § 1961 .......................................................................................... 26, 73, 103

18 U.S.C. § 1961(1) ...................................................................................... 26, 73, 103

18 U.S.C. § 1962 ......................... 26–28, 50, 55, 74, 84, 99, 103, 106, 108

18 U.S.C. § 1962(d) ................................... 26–27, 50, 84, 99, 103, 106

18 U.S.C. § 1964 ................................................................... 56, 72–74, 103

18 U.S.C. § 1964(c) ..................................................................................................... 72

18 U.S.C. § 664 ..............17, 21, 26, 29, 44, 47, 50, 54–56, 61, 65, 68, 72–75, 77, 82–84, 99, 103–105, 107

28 U.S.C. § 1291 ......................................................................................................... 10

28 U.S.C. § 2106 ......................................................................................................... 52

28 U.S.C. § 636 ..................................................................... 27–28, 34, 52, 112–114

28 U.S.C. § 636(b)(1) ........................................................................ 34, 52, 114

29 U.S.C. § 1001(a) .................................................................................... 12

29 U.S.C. § 1056(d) .................................20, 27, 50, 58, 62–63, 71, 89, 108–112

29 U.S.C. § 1056(d)(1) ................................................................................ 71

29 U.S.C. § 1056(d)(3) ........................20, 27, 50, 58, 62–63, 89, 108–112

29 U.S.C. § 1056(d)(3)(B)(ii) ............................................................... 20, 62

29 U.S.C. § 1056(d)(3)(B)(ii)(II) ................................................................. 20

29 U.S.C. § 1056(d)(3)(C) ........................................................................... 20

29 U.S.C. § 1056(d)(3)(H)(i) ...........................................27, 50, 108–111

29 U.S.C. § 1056(d)(3)(K) ............................................................ 20, 58, 63, 110

29 U.S.C. § 1132(a)(1)(B) ........................................................................... 65

29 U.S.C. § 1132(a)(3) .................................................. 21, 61, 65, 67–68, 72

29 U.S.C. § 1144 ........................................................................................ 54

42 U.S.C. § 1983 .............24–25, 27, 29, 38, 44, 50, 54, 62, 70, 72, 90–91, 94, 97–100, 111–112

42 U.S.C. § 1988 ........................................................................ 71, 88, 93

Tex. Civ. Prac. & Rem. Code § 30.017 .................................... 49, 70, 91–92

Tex. Fam. Code ch. 9 ................................ 13, 18, 23, 49, 63–64, 72, 87–90

Tex. Fam. Code § 201.017 ............................................ 24, 36, 49, 87, 91–92

Tex. Fam. Code § 9.102 ............................................................................ 90

## Rules

5th Cir. R. 28.2.1 ........................................................................................ 2

Fed. R. App. P. 4(a)(1)(A) ........................................................................ 10

Fed. R. App. P. 25(b), (c) ....................................................................... 116

Fed. R. App. P. 32(a)(7)(B) ..................................................................... 116

Fed. R. Civ. P. 7(b)(1)(B) .......................................................................... 86

Fed. R. Civ. P. 8 ................................................................................... 82, 86

Fed. R. Civ. P. 8(b)(1)(A) .......................................................................... 86

Fed. R. Civ. P. 11 ..........................................................27–28, 39, 112, 114

Fed. R. Civ. P. 12(b) ................. 22–24, 31–32, 35–36, 51–53, 85–86, 98, 102

Fed. R. Civ. P. 12(b)(1) ......................................... 22, 32, 36, 52, 85–86

Fed. R. Civ. P. 12(b)(6) ................. 22–23, 31–32, 35–36, 51, 53, 85–86, 98, 102

Fed. R. Civ. P. 12(c) ...............25–26, 31, 33–36, 38, 50–51, 53, 56, 93, 96, 98–100, 102

Fed. R. Civ. P. 15(a)(2) ........................................................................ 78, 81

Fed. R. Civ. P. 16 ................................................................................ 78, 81

Fed. R. Civ. P. 54(b) ................................................. 22, 30–33, 37, 82

Fed. R. Civ. P. 58 ................................................................................ 32, 34

Fed. R. Civ. P. 59(e) ............................................................................ 30–32

## Other Authorities

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006) ............................................. 11

Tex. R. Disciplinary P. 17.09 .................................................................... 24

## Jurisdictional Statement

This Court has jurisdiction under 28 U.S.C. § 1291 over the district court's March 10, 2026 final judgment. After accepting the February 19, 2026 findings and recommendation, the district court entered a separate judgment disposing of the remaining claims and parties. ROA.2981-2992; ROA.3064-3065. The present appeal encompasses the reviewable interlocutory orders and rulings that merged into that judgment.

The prior appeal in No. 24-10543 was dismissed for lack of jurisdiction and remanded for further proceedings. ROA.2183-2188. The March 10, 2026 judgment is therefore the first final, appealable judgment in this action.

Yan filed his notice of appeal on March 30, 2026, 20 days after entry of judgment. ROA.3070-3071. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## Introduction

"*To provide **economic security** for **all** Americans, and for other purposes.*"

> —*Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (Aug. 17, 2006)* (enacting clause; also referencing amendments to ERISA).

1) Yan *pleaded* an ERISA-fund-diversion case and a legal-services consumer-injury case. The district court dismissed a divorce grievance. That is the error at the center of this *Rule 12* appeal. Yan alleged that Barrows and Ybarra claimed criminal-case fees through a family-court affidavit; DeAngelis then extracted ERISA funds via a nonappealable temporary order with no pleading; Pigg, awarded fees himself, waived his client's objection; Barrows relabeled the order "spousal support"; and U.S. Bank paid despite the known conflict. The court recast this as divorce relitigation and money laundering—Yan's actual premise invisible. Yan alleged that *Texas* defendants—State Bar members and legal-services actors—used a non-QDRO mechanism to divert $25,000 from his *Minnesota* ERISA-protected 401(k) to private attorney-fee claimants who were not statutory alternate payees, cloaking the plan-asset diversion as ordinary court business, as they had allegedly done to many Texas legal-services consumers over the last decade. The Fifth Circuit framed the suit as alleging a "decade-long and widespread pattern" of "racketeering activity" conducted by the State Bar of Texas ("SBTX"), seven members, and other entities. ROA.2187. As pleaded, that alleged pattern included routing ERISA-protected

retirement assets through a fabricated "spousal support" label to attorney-fee claimants. **The district court did not test that case. It replaced it**.

2)     The question matters beyond a Texan and his *Minnesota* 401(k). **Congress did not leave federal retirement security to state labels, private fee claims, or creative paperwork**. It declared that employee benefit plans affect "the continued well-being and security of millions of employees and their dependents" and involve a "national public interest," and "substantially affect the revenues of the United States." 29 U.S.C. § 1001(a). That principle drives ERISA's anti-alienation rule, preemption framework, and federal remedies.

3)     "Our ruling must be consistent with the congressional scheme to assure the security of plan participants and their families in every State." "ERISA is an intricate, comprehensive statute."[1] If paperwork fiction can defeat ERISA, then ERISA protects only funds that have not yet been relabeled. The complaint alleged not an isolated error, but a recurring state method for defeating federal ERISA protection before meaningful review is possible: **family-court routing**, **non-appealable**-temporary-order labels, **ERISA-bypass paperwork**, and **Texas-based institutional shielding across cases**.

---

[1] *Boggs v. Boggs*, 520 U.S. 833, 840–41 (1997).

4) The pleaded wrong was not fee litigation by family lawyers. It was the extraction mechanism itself, capped by post-transfer shielding from institutional actors.

5) Yan's case supplies the concrete example. The fund, injury amount, recipients, alleged conspiracy communications, and federal protection were **all identified**. On April 13, 2022, an associate judge ordered Yan to withdraw $50,000 from his Minnesota 401(k): $25,000 for opposing counsel Barrows and $25,000 for Yan's counsel Pigg. ROA.1198.

6) **No QDRO petition. No support pleading. No support hearing. No support finding in the April 13 rendition**. Four negations. One protected fund. The complaint therefore alleged that the attempt to reach the protected fund came *before* any lawfully invoked Texas post-divorce QDRO process existed.

7) The DeAngelis dismissal contains a self-contained reversible error that requires no engagement with the merits: in overruling Yan's first DeAngelis objection, the order cited *McKinley v. Abbott*[2] as support in the immunity analysis for the proposition that state judges sued because of their office receive immunity unless the pleadings clearly articulate an independent constitutional violation. ROA.2085. *McKinley* did not involve a judge. It addressed the Eleventh Amendment

---

[2] *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011).

bar to state-law claims against the Texas Attorney General and a First Amendment challenge to a barratry statute. That matters here because DeAngelis was alleged to have signed the order that supplied the non-QDRO routing mechanism for ERISA-protected retirement funds. Page 406 contains no analysis of judicial immunity, associate-judge authority, Chapter 9, QDROs, or ERISA. **A dismissal with prejudice cannot rest on a case used for a proposition it does not contain**.

8)      The complaint did not allege vague billing abuse. It identified a separate criminal case, No. E0129990-1, and alleged that Ybarra of the same Firm represented Yan's wife in that matter before the 401(k) transfer. ROA.1185; ROA.1192-1193. The point was jurisdictional and statutory: the Family Code did not authorize State Bar members to route private consumer legal-service fees from a criminal case through a family-case fee request and collect them from Yan's ERISA-protected 401(k).

9)      The complaint alleged that defect with document-level specificity. Barrows's sworn fee affidavit presented the bills as family-case fees, but the attached records allegedly included charges from the separate criminal case. That false-fee predicate preceded the attempt to reach Yan's retirement account.

10)     **The relabeling was the channel, and the record shows when it happened.** After Yan allegedly testified that some charges came from the criminal case, DeAngelis still used the 401(k) as the payment source. Barrows then submitted

papers that called the fee award "spousal support" for the first time. ROA.1067; ROA.1076-1077. The complaint attached the admission:

> "In order for us to obtain our attorney's fee, we must say the order is for spousal support…," and "there is no way around it." ROA.1139.

11)     The central question is narrow: later paperwork cannot turn a private attorney-fee claim—legal-services debt—into ERISA-qualified support. Relabeling cannot do what ERISA forbids: move protected retirement assets to non-alternate-payee attorneys. The papers created no entitlement. They supplied the extraction device.

12)     The complaint did not plead a blind release. It pleaded notice, conflict, and payment anyway. Pigg allegedly knew the altered order "would not be true." ROA.1140. U.S. Bank allegedly knew the orders conflicted. ROA.2034-2035. Yet the complaint alleged distribution anyway.

13)     The live Third Amended Complaint ("TAC") did not plead Yan's case as isolated. TAC ¶125 pleaded additional court-record evidence dating back nine years and attached Exhibit 9, the 2014 Associate Judge's Report/order in Cause No. 360-549246-13. ROA.1085; ROA.1203–1204. Barrows Defendants' reply described Exhibit 9 as a "2014 Associate Judge's Report for the 360th District Court" permitting withdrawal from a 401(k) for attorney's fees. ROA.1630. Thus, even *before* the proposed Fourth Amended Complaint (the "PFAC"), the *live* pleading "alleged two predicates" and identified the same attorney-fee-through-retirement-

account mechanism in another Texas family-court case. ROA.2124. Those allegations satisfied RICO's two-predicate-act requirement and supported pattern because they showed related conduct beyond one isolated transaction.

14) The broader pattern evidence also was not first raised only in the PFAC. ROA.1484; ROA.1488-1489. Earlier record filings had already placed additional Texas family-court 401(k)-fee materials before the district court, including the 2011–2012 Tarrant County *Dickerson* materials involving requests and orders concerning the American Airlines SuperSaver 401(k). ROA.1513-1543. The PFAC then consolidated and expanded that pattern evidence into formal *H.J. Inc.* allegations, identifying additional Texas family-court orders and filings from Travis, Tarrant, and Comal Counties that used temporary domestic-relations process to reach ERISA-protected retirement assets for attorney fees or fee-adjacent obligations. It identified, among others, a June 16, 2009 Travis County proposed order seeking 401(k)-sourced interim fees; a 2011–2012 Tarrant County sequence involving a $30,000 request, a receiver order authorizing $61,700 from an American Airlines SuperSaver 401(k), and orders directing 401(k) proceeds to attorney fees; and the 2014 Tarrant County 360-549246 case directing $12,000 from a 401(k), including $6,000 to counsel's IOLTA, followed by an interlocutory DRO. ROA.2932–2961. The district court did not analyze the TAC's second-order allegation, the earlier amendment-through-objection materials, or the PFAC's

consolidated pattern allegations under *H.J. Inc.*; at Rule 15 futility, the proposed allegations had to be accepted as true under the Rule 12 standard.

15) Yan's allegations do not ask a federal court to supervise SBTX discipline. He alleges that, after BODA granted Yan's appeals from the initial dismissals of the Barrows and Pigg grievances and asked the Office of the Chief Disciplinary Counsel to initiate investigations, SBTX disciplinary machinery was used to shield and cover up an alleged scheme to circumvent 29 U.S.C. § 1056 and abstract assets from employee pension benefit plans through QDRO-type instruments and court orders.[3]

16) Read as pleaded, the RICO theory runs through ERISA plan money. The complaint alleged protected assets, non-alternate-payee recipients, altered papers, false labels, and institutional shielding. That is a § 664-centered theory. The district court answered a § 1956 case Yan did not plead.[4]

17) The complaint therefore alleged a concrete ERISA injury, a federal rule of decision, and a federal remedy. The district court dismissed without deciding the ERISA question that controlled the case. Dismissal with prejudice cannot rest on a case Yan did not plead.

18) As pleaded, the state-court predicate act hid the ERISA-bypass mechanism inside a nonappealable Family Code temporary order: the label made attorney-fee

---

[3] ROA.1082-1084; ROA.1090-1091; ROA.1097-1098.
[4] ROA.1070-1071; ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

debt look like "spousal support," the temporary order moved protected retirement assets before independent judicial review, and the review vacuum left legally inexperienced litigants with a fait accompli. Later SBTX disciplinary shielding and the dismissal with prejudice left the extraction mechanism untested.

19) This appeal asks whether Rule 12 permits dismissal by reframing: ERISA diversion becomes divorce dissatisfaction; § 664 ERISA-plan predicate acts become § 1956 money-laundering acts; a Sherman Act § 2 legal-services consumer-monopoly theory becomes a § 1 competitor-dispute theory; defendant-specific conduct becomes boilerplate immunity; and amendment becomes futile by measuring the wrong pleading. That is not pleading review. It is premise substitution.

20) This appeal also differs materially from Yan's October 2024 opening brief in No. 24-10543. The later authorities do not change the theory. They expose the framing error. These authorities[5] sharpen the boundaries governing source of injury, state-official immunity, Chapter 9 authority, *Younger* abstention, and de facto appellate review.

21) This Court's 2025 remand order fixed the frame the district court later ignored. A higher tribunal's correction is not a suggestion; it fixes the frame for what comes

---

[5] *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024); *Williams v. Reed*, 604 U.S. 168 (2025); *Doe v. Dynamic Physical Therapy, LLC*, No. 25-180, slip op. at 1 (U.S. Dec. 8, 2025) (per curiam); *Morrison v. Morrison*, 729 S.W.3d 328 (Tex. 2026); *Bellinsky v. Galan*, No. 24-1351, 2025 WL 2047809 (10th Cir. July 22, 2025) (unpublished); and *Miroth v. County of Trinity*, 136 F.4th 1141 (9th Cir. 2025).

next. The panel described a suit alleging a "decade-long and widespread pattern" of "racketeering activity" and recognized Pigg's liability under distinct claims had not been adjudicated, or even addressed. Yet the district court returned to the same domestic-relations frame and supplied recycled reasoning instead of fresh defendant-specific review. *Moody v. NetChoice, LLC*[6] confirms that a reviewing court may not affirm or decide a case under an incomplete legal frame; questions requiring the correct frame must be answered by the court below in the first-instance. The same "precise error the Supreme Court identified in *Moody*" warrants the same remedy here. *NetChoice Remand.*[7]

22)    Strip away every label and one fact survives: a lawyer wrote that the order had to *say* "spousal support" because there was "no way around it." ROA.1079. That is a written admission the support finding was invented to reach a protected retirement account. Across two rounds of dismissal, no court has ever analyzed that email.

---

[6] *Moody*, 603 U.S. at 726.
[7] *NetChoice*, 121 F.4th at 498.

## Issues Presented

This appeal presents global, defendant-specific, and ancillary errors from dismissal, amendment, sanctions, and access rulings. The issues follow the argument sequence.

I. Global Reversible Errors (Issues 1–9)

A.     ERISA controls the alleged non-QDRO transfer

1) Whether ERISA preempts a judge-signed temporary QDRO-type order allegedly procured through materially altered proposed-order language and used with a fabricated "spousal support" label to divert $25,000 from Yan's ERISA 401(k) to private attorney-fee claimants.

   1(a). Whether the temporary order failed ERISA's QDRO requirements because it was not a valid domestic-relations order under Texas domestic-relations law as § 1056(d)(3)(B)(ii)(II) requires, and lacked the federal content § 1056(d)(3)(C) requires before distribution.

   1(b). Whether private attorney-fee claimants may receive ERISA retirement funds through an altered "spousal support" label when they are not statutory alternate payees under § 1056(d)(3)(K).

1(c). Whether § 1132(a)(3) permits prospective relief against continued use, enforcement, or implementation of the alleged non-QDRO mechanism.

2) Whether ERISA's anti-alienation rule permits restoration of funds allegedly extracted from ERISA-protected plan assets.

B. *Younger* abstention does not apply

3) Whether *Younger* bars federal claims for defendants' own ERISA-fund diversion and shielding conduct rather than de facto appellate review of a state judgment.

4) Whether *Sprint* Category 3 applies absent contempt, supersedeas, or comparable judicial-enforcement machinery.

C. The district court answered a different case

5) Whether Rule 12 permitted the court to recast ERISA diversion as domestic-relations dissatisfaction, credit disputed later instruments, substitute § 1956 for pleaded § 664, and treat a Sherman Act § 2 claim as a § 1 theory.

D. Premature foreclosure of amendment and merits review

6) Whether dismissal with prejudice under the "best-case" doctrine was error where the court identified no dispositive deficiencies, used unbriefed substituted theories, and counted technical or party-joinder amendments as merits opportunities.

7) Whether Doc. 58 requires vacatur because the magistrate judge imposed an extra-textual "extraordinary circumstances" amendment bar before dispositive motions and without authority under Rules 15, 16, or 83.

8) Whether denial of Doc. 181 requires vacatur because Yan sought Rule 54(b) reconsideration and amendment/supplement treatment, but the court did not identify which relief it rejected.

9) Whether denial of Doc. 210 abused discretion because Yan sought prompt post-remand amendment and the court measured futility against the superseded TAC rather than the PFAC and Wang affidavit, including materially more specific ERISA, RICO, U.S. Bank, writ-sequence, and pattern allegations.

## II. Defendant-Specific Errors (Issues 10–16)
### A. Sherman Act § 2 substitution

10) Whether the court erred by dismissing Yan's Sherman Act § 2 consumer-monopoly claim with prejudice after replacing it with a § 1-type theory and, as to SBTX, entering Rule 12(b)(6) dismissal after rejecting SBTX's Rule 12(b)(1)

immunity challenge, even though SBTX never sought Rule 12(b)(6) dismissal of the pleaded § 2 theory.

B.     DeAngelis

11)     Whether DeAngelis's dismissal must be vacated because the court applied judicial-immunity and no-adversity doctrines without analyzing the challenged function, authority, criminal-case fee source, non-QDRO ERISA transfer, or fabricated "spousal support" label.

11(a). Whether an associate judge may invoke QDRO-type process to reach ERISA retirement funds pre-decree and outside Chapter 9's decree-based framework.

11(b). Whether *Bauer*'s no-adversity rule applies to a judge's own pre-decree QDRO-type order directing ERISA 401(k) funds to private attorneys without petition, Chapter 9 authority, or neutral statutory basis.

11(c). Whether blanket judicial immunity was proper without the required function-by-function analysis of alleged temporary QDRO-type conduct outside Chapter 9 authority and whether that conduct fell within jurisdiction under Texas law.

11(d). Whether § 201.017 can enlarge federal common-law immunity or bar federal causes of action.

C.     SBTX Defendants

12)     Whether the SBTX Defendants' dismissals must be vacated because Yan was not a disciplinary respondent, did not seek review of a disciplinary judgment, and pleaded the grievance sequence as notice, enforcement connection, and post-notice shielding of ERISA-fund diversion, yet the district court treated the case as a grievance-outcome challenge and failed to analyze whether federal RICO, antitrust, § 1983, and *Ex parte Young* theories could proceed.

12(a). Whether TRDP 17.09 or other state-law/state-rule immunity can bar federal RICO, antitrust, and § 1983 claims where federal law supplies the rule of decision and *Howlett*, *Haywood*, *Williams*, and *Taylor* forbid state immunity from barring federal claims.

12(b). Whether *Younger*, disciplinary recasting, or standing defeats claims challenging SBTX Defendants' later conduct preserving the alleged diversion's consequences, not the original extraction itself.

12(c). Whether the court erred by rejecting *Ex parte Young* without officer-by-officer and function-by-function analysis of prospective relief against continued disciplinary shielding.

D.    Barrows-Ybarra and Pigg

13)    Whether the Barrows-Ybarra dismissals must be vacated because the court treated the complaint as ordinary advocacy despite pleaded false-fee proof, altered-order conduct, fabricated support relabeling, and coordinated ERISA-fund diversion.

13(a). Whether attorney immunity applies without deciding whether alleged false-fee proof, altered-order conduct, or coordinated use of court machinery exceeded ordinary advocacy.

13(b). Whether Texas attorney immunity can categorically bar federal statutory claims, including § 1983, RICO, and antitrust, absent source-of-law analysis.

13(c). Whether *Lugar* and *Wyatt* permit § 1983 claims against Barrows-Ybarra for allegedly using state machinery to extract ERISA retirement funds.

14) Whether Pigg's Rule 12(c) dismissal must be vacated because the post-remand ruling imported prior boilerplate rather than adjudicating Pigg's distinct federal claims.

E. RICO theory substitution

15) Whether the RICO dismissals and futility ruling must be vacated because the court replaced Yan's § 664 ERISA-plan predicate with § 1956 reasoning, applied the wrong § 1962(d) standard, and denied leave without testing the PFAC.

15(a). Whether the court erred by treating § 664 as lacking a standalone civil cause of action when Yan pleaded it as a RICO predicate under § 1961(1), not an independent claim, and RICO predicates are criminal statutes by statutory design.

15(b). Whether the court erred by substituting § 1956 money-laundering reasoning for pleaded § 664 ERISA-plan predicate acts supported by instruments moving $25,000 from ERISA protection to non-alternate-payee attorneys.

15(c). Whether the court misapplied § 1962(d) by requiring each defendant to satisfy a pattern requirement, contrary to *Elliott* and *Salinas*, without identifying the enterprise or objective.

F. U.S. Bank

16) Whether U.S. Bank's dismissal must be vacated because the court treated the transaction as routine despite pleaded notice, acknowledged order conflict, and distribution of ERISA funds.

16(a). Whether the court disregarded U.S. Bank-specific allegations, misapplied § 1962(d), and treated post-acknowledgment distribution as a single lawful transaction rather than the final step in the pleaded predicate chain.

16(b). Whether U.S. Bank was plausibly alleged as a § 1983 co-conspirator under *Lugar* after acknowledging "direct conflict" yet releasing ERISA funds.

16(c). Whether U.S. Bank breached ERISA/QDRO duties under § 1056(d)(3), including § 1056(d)(3)(H)(i), by distributing after acknowledging conflict without separately accounting or determining QDRO status.

III. Sanctions, Access, and Reassignment (Issues 17–19)

A. Sanctions and access restrictions

17) Whether the sanctions rulings must be vacated because the court treated Rule 11 safe-harbor refiling and § 636 objections as sanctionable abuse rather than protected litigation conduct.

    17(a). Whether refiling a Rule 11 motion after the safe-harbor period was frivolous where the challenged conduct remained uncorrected.

    17(b). Whether treating § 636 objections as sanctionable rather than issue-preserving conduct was error.

18) Whether the *sua sponte* pre-filing injunction must be vacated where the only warning concerned future sanctions motions, no further sanctions motion had been filed, and the injunction instead rested on § 636 objections without prior notice or hearing.

19) Whether reassignment is required under *Corrugated Container* because post-recusal reassignment did not produce de novo Article III review, the final judgment used one-page wholesale adoption, and fresh review would impose no meaningful duplication cost.

## Statement of the Case

A.   <u>The district court dismissed the federal case Yan actually pleaded before factual clarification or meaningful amendment</u>

1.   On July 21, 2023, Yan filed his original complaint. ROA.31. The operative Third Amended Complaint asserts 18 U.S.C. § 1962 RICO claims on alleged violations of 18 U.S.C. §§ 664, 1341, and 1343; 15 U.S.C. § 2 antitrust claims; and 42 U.S.C. § 1983 claims. ROA.1054.

2.   The defendants were the SBTX; the Barrows Firm (the "Firm"); Barrows and Ybarra (the "Barrows-Ybarra Defendants"); Pigg; Marin, Martinez, and Craig (the "Disciplinary Defendants"); DeAngelis; U.S. Bank; and Tarrant County. These brief uses "SBTX Defendants" for SBTX and the Disciplinary Defendants, "Attorney Defendants" for the Barrows-Ybarra Defendants and Pigg, and "RICO Defendants" and "Antitrust Defendants" only when discussing those claims. These labels do not collapse the pleaded RICO-person/enterprise distinction. Yan sought prospective and monetary relief. ROA.1087-1133.

3.   Yan's amendments were not repeated failed merits amendments. The First Amended Complaint corrected the Firm caption. ROA.290. The Second Amended Complaint complied with Doc. 42's ECF directive by filing exhibits with the complaint. The TAC added U.S. Bank without materially changing the existing claims. Yan preserved that chronology below. Yet when granting leave for the TAC,

29

the magistrate judge *sua sponte* barred further amendment absent "extraordinary circumstances," though no party requested or briefed that restriction. ROA.10-11;

4. After Yan filed the third amended complaint, DeAngelis, Tarrant County, Barrows-Ybarra Defendants, and SBTX Defendants filed motions to dismiss. Yan opposed the motions, and the defendants replied. ROA.11-13.

5. On December 28, 2023, the magistrate judge issued an FCR recommending dismissal of the claims against DeAngelis, Tarrant County, Barrows-Ybarra Defendants, and SBTX Defendants. Yan objected, the affected defendants responded, and Yan filed supplemental objections. U.S. Bank then filed its own motion to dismiss, which Yan opposed. U.S. Bank replied. ROA.16-19.

6. On April 23, 2024, the district court accepted the FCR, separately ruled on U.S. Bank's motion, and entered judgment. Yan then filed a Rule 59(e)/54(b) motion explaining that Pigg had answered and remained unadjudicated. The court denied the motion the next day without adjudicating Pigg. ROA.20. The Fifth Circuit later confirmed that Pigg's liability "was not adjudicated, or even addressed," and that the April 2024 judgment was not final. The resulting appellate detour was court-created, not a ground to deny merits amendment after remand.

7. This brief refers to the 2024 FCR and the April 23 order together as the "Pittman Decisions."

8.    Dismissal roadmap. The court's path ran from court-compelled technical refiling, to the amendment lock, first FCR, April 2024 dismissal order and judgment, Yan's Rule 59(e)/54(b) warning that Pigg had been omitted, the Fifth Circuit remand, the post-remand FCR, Pittman's recusal, and final judgment. The same domestic-relations premise carried through standing, *Younger*, immunity, Rule 12(b)(6), Rule 12(c), and amendment.

i.    Doc. 42 and Docs. 46-48 — court-compelled technical refiling. The court converted a filing-mechanics issue into an amendment event by striking separately filed exhibits and stating, "Plaintiff must seek leave to file an amended complaint at this stage in the proceedings." The defect was separate exhibit filing, not merits pleading. Yan complied by filing a Second Amended Complaint consolidating exhibits, not repleading merits. Later "best-case" reasoning counted that technical compliance as a merits opportunity. ROA.560.

ii.   Doc. 58 — amendment lock. The magistrate judge granted leave to file the TAC but added that no further amendment would be allowed absent "extraordinary circumstances." That became the amendment-lock gate later used against Doc. 210, and Doc. 214 later quoted and relied on the same language. ROA.10-11.

iii. Doc. 121 — first FCR. The December 28, 2023 FCR recommended dismissal of DeAngelis, Tarrant County, SBTX Defendants and Barrows-Ybarra Defendants. It did not adjudicate Pigg and did not include U.S. Bank's later motion. It supplied the first dismissal map: standing, immunity, *Younger*, attorney immunity, and Rule 12(b)(6) RICO/antitrust sufficiency. ROA.1682-1699.

iv. Doc. 148 — April 23, 2024 order. Judge Pittman accepted Doc. 121 in part, adjusted prejudice treatment, and separately decided U.S. Bank's Doc. 126 motion. This became the central trial-court roadmap order: it grouped Rule 12(b)(1) dismissals and Rule 12(b)(6) dismissals, then ordered the civil action dismissed. ROA.2078-2095.

v. Doc. 149 — April 23, 2024 judgment. The court entered a Rule 58 judgment "pursuant to" Doc. 148 and dismissed the civil action. That judgment purported to close the case, but it was defective because Pigg had not been adjudicated. ROA.2096.

vi. Docs. 150 and 153 — Rule 59(e)/54(b) warning and unexplained denial. Yan promptly explained that Pigg had answered and had not moved under Rule 12(b)(1) or 12(b)(6), so the judgment disposed of fewer than all claims. Because no final judgment existed, Rule 54(b) supplied a revision vehicle regardless of the Rule 59(e) label. The court denied relief without adjudicating

Pigg; the Fifth Circuit later confirmed that exact defect. ROA.2097-2104; ROA.2186-2188.

vii.  Fifth Circuit remand / Docs. 174-175. The Fifth Circuit dismissed the first appeal for lack of jurisdiction because every defendant except Pigg had moved to dismiss, Pigg answered, and Pigg's liability "was not adjudicated, or even addressed." That remand forced the case back to finish the omitted Pigg piece and confirms that Docs. 148/149 did not complete the roadmap. ROA.2183-2188.

viii.  Docs. 181 and 185 — reconsideration denied with amendment request unresolved. After remand, Yan moved under Rule 54(b) to reconsider interlocutory orders, including Doc. 148, and asked that the contemporaneous papers and exhibits be construed as amendments or supplements. Doc. 185 denied reconsideration without explaining whether it rejected reconsideration, amendment/supplement treatment, or both.[8]

ix.  Doc. 214 — February 19, 2026 FCR. The FCR recommended granting Pigg's Rule 12(c) motion and recommended denying Yan's motion for leave to file the Fourth Amended Complaint. It incorporated Judge Pittman's earlier RICO/antitrust analysis against other defendants and applied it to Pigg,

---

[8] ROA.24; ROA.2365-2369; ROA.2372-2396.

completing the omitted-Pigg part by importing Doc. 148's reasoning rather than conducting a fully separate Pigg-specific merits analysis. ROA.2981-2992.

x.   Docs. 215-216 — Pittman recusal and reassignment. After Yan moved to recuse Judge Pittman, Judge Pittman recused and the case was reassigned to Senior Judge Terry R. Means. ROA.2993; Doc. 216. Reassignment did not reset the inherited premise; § 636(b)(1) still required de novo determination of specifically objected-to portions of Doc. 214, but Judge Means adopted the FCR without independent merits reasoning.

xi.   Doc. 224 — March 10, 2026 adoption order. Judge Means accepted Doc. 214, denied leave to amend, granted Pigg's Rule 12(c) motion, and dismissed the case with prejudice. The order recited review under § 636(b)(1), stated that the magistrate judge's findings and conclusions were correct, and entered disposition; it identified no specific objection and supplied no independent merits reasoning. ROA.3064.

xii.   Doc. 225 — March 10, 2026 final judgment. The court entered Rule 58 final judgment dismissing the case with prejudice. That judgment is the appealable final judgment and merges the prior interlocutory rulings. ROA.3065.

9.   The practical sequence was: technical refiling through amendment mechanics; Doc. 58's "extraordinary circumstances" lock; recasting ERISA 401(k) allegations

as a divorce fee dispute; threshold exits where available; and a purported final judgment after Yan identified the omitted-Pigg defect.[9]

10.     After the resulting appellate detour, the court used Pigg's Rule 12(c) motion to finish the omitted portion by importing earlier RICO/antitrust analysis and denying amendment under the same lock, delay, futility, and "best-case" pathway. After Pittman recused, the successor judge adopted that roadmap without independent merits reasoning.[10]

11.     The Rule 15 prejudice flowed from the court's sequence: it converted technical compliance into amendment history, used that history to support the amendment lock, then used the lock and court-created omitted-Pigg appeal detour to deny the first true merits amendment after remand. Pittman had notice of the finality defect in Doc. 150 but denied relief without adjudicating Pigg; the remand therefore could not fairly count against Yan as delay.[11]

12.     The appellate error is therefore not isolated to one docket entry: the roadmap began from a substituted domestic-relations premise and carried that premise through standing, *Younger,* immunity, Rule 12(b)(6), Rule 12(c), and Rule 15. The

---

[9] ROA.560; ROA.1682-1699; ROA.2078-2095; ROA.2097-2104.
[10] ROA.2186-2188; ROA.2981-2992; ROA.2993-3002; ROA.3064.
[11] ROA.560; ROA.2097-2104; ROA.2186-2188; ROA.2972-2973; ROA.2981; ROA.2990-2991; ROA.3023-3026.

defendant-specific sections below show how that roadmap produced different errors for different defendants.

13. Because different defendants were dismissed on different grounds and at different stages, Table 1 maps the defendant-specific rulings used throughout the argument:

Table 1: Summary of Defendant Dismissals in the District Court Proceedings

| Defendant(s) | Docket / Motion | Claims Dismissed | Ground(s) for Dismissal | Ruling |
|---|---|---|---|---|
| DeAngelis | Docs. 121, 148, 149; Mot. 69 | All claims. | No case or controversy under *Bauer*; judicial immunity under Tex. Fam. Code § 201.017 and *Holloway*; *Younger* alternative. | Without prejudice on jurisdictional grounds. |
| Tarrant County (not challenged on appeal) | Docs. 121, 148, 149; Mot. 70 | Not challenged on appeal. | Traceability/standing and Monell-control grounds. | Not challenged; included only for procedural roadmap. |
| SBTX Defendants | Docs. 121, 148, 149; Mot. 83 | All claims. | State-agency immunity for non-RICO/non-antitrust claims; RICO/antitrust survived Rule 12(b)(1) but were dismissed under Rule 12(b)(6) for pleading insufficiency. | Without prejudice for immunity-dismissed claims; with prejudice for RICO/antitrust. |
| Ybarra | Docs. 121, 148, 149; Mot. 75 | All claims. | Standing/no case-or-controversy and attorney immunity for non-RICO/non-antitrust claims; RICO/antitrust dismissed under Rule 12(b)(6) for pleading insufficiency. | Without prejudice for jurisdictional/attorney-immunity dismissals; with prejudice for RICO/antitrust. |
| Barrows, Firm | Docs. 121, 148, 149; Mot. 90 | All claims. | Standing/no case-or-controversy and attorney immunity for non-RICO/non-antitrust claims; RICO/antitrust dismissed under Rule 12(b)(6) for pleading insufficiency. | Without prejudice for jurisdictional/attorney-immunity dismissals; with prejudice for RICO/antitrust. |
| U.S. Bank | Docs. 148, 149; Mot. 126 | All claims. | No civil cause of action under cited criminal statutes; no RICO pattern; private entity not state actor; no pleaded fiduciary-breach facts. | With prejudice. |
| Pigg | Docs. 214, 224, 225; Mot. 191 | All remaining claims. | Rule 12(c): no RICO pattern; no antitrust intent/agreement details; private actor/no state action or meeting of minds; *Twombly*/*Iqbal* pleading grounds.[12] | With prejudice; final closure of case. |

---

[12] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

14. The narrative below addresses only the later procedural developments necessary to the issues presented; Table 1 remains the master reference for the district court's defendant-specific rulings.

B. <u>After remand, Yan promptly sought reconsideration, supplementation, and amendment, but the court again shut every corrective path</u>

15. The Wang affidavit had been executed on October 18, 2025. ROA.2538-2540.

16. On October 20, 2025, the Fifth Circuit's judgment and mandate in No. 24-10543 were entered on the district-court docket, dismissing the appeal for lack of jurisdiction and remanding the case to the district court for further proceedings. ROA.2183-2188.

17. That same day, Yan filed Doc. 181, a Rule 54(b) reconsideration motion, with Doc. 182 and Doc. 183. He explained that no final judgment existed, jurisdiction had returned, and the court could reconsider interlocutory rulings. He also asked that his contemporaneous papers and exhibits be construed as amendments/supplements. ROA.2365-2369; ROA.2372-2396.

18. In Doc. 182, Yan squarely invoked the remand frame: the Fifth Circuit had "correctly summarized" the suit as alleging a "decade-long and widespread pattern" of "racketeering activity," unlike Doc. 148's disgruntled-litigant frame. The court nevertheless denied Doc. 181 without explanation. ROA.2384-2386; ROA.24.

19. On November 4, 2025, the district court denied (Doc. 181) by electronic order, stating only that it had reviewed the motion, the docket, and the applicable law. The same day, the court struck Yan's summary-judgment filings as premature because no scheduling order had yet issued, and referred the case to Magistrate Judge Cureton for pretrial management. ROA.24.

20. On December 30, 2025, Yan filed (Doc. 210), a motion for leave to file a Fourth Amended Complaint, with the PFAC and exhibits attached. Pigg objected on January 4, 2026; Yan replied the same day; and U.S. Bank responded on January 20, 2026. ROA.24; ROA.2981.

21. On February 19, 2026, the magistrate judge issued findings, conclusions, and a recommendation addressing both Pigg's Rule 12(c) motion and Yan's motion for leave to amend. ROA.2981-2992.

22. On February 24, 2026, Yan moved to recuse Judge Pittman. That recusal was granted, and on February 27, 2026, the case was reassigned to Senior Judge Terry R. Means for all further proceedings. Yan then filed objections to the February 19, 2026 recommendation on March 1 and March 2, 2026. ROA.2993; ROA.3023-3057; ROA.24.

23. The February 19, 2026 recommendation incorporated Judge Pittman's earlier RICO and antitrust analysis against other defendants and applied it to Pigg. It also found no facts supporting antitrust elements, no specific agreement, time, date,

circumstances of formation, or meeting of minds on § 1983, and no basis for leave to amend because Yan had pleaded his "best-case," delayed unduly, and sought futile amendment. ROA.2981-2992.

24.    On March 10, 2026, Judge Means accepted the FCR as the court's findings and conclusions, denied leave to file the PFAC, granted Pigg's Rule 12(c) motion, and entered final judgment dismissing the case with prejudice. Judge Means stated that Yan's objections merely rehashed prior arguments and were overruled. ROA.3064-3065.

C.    <u>The court then compounded the merits errors by sanctioning issue-preserving conduct and restricting further access to review</u>

25.    Yan filed two Rule 11 motions, one against Tarrant County's counsel and one against SBTX's counsel. Tarrant County's counsel responded by invoking the 21-day safe-harbor provision, while SBTX's counsel did not raise that argument. The magistrate judge issued one FCR striking both Rule 11 motions without specifying reasons.[13]

26.    After 21 days, Yan refiled Rule 11 motions against SBTX's counsel and Tarrant County's counsel. The magistrate judge then issued two FCRs.[14]

---

[13] ROA.477-488; ROA.274-280; ROA.502-513; ROA.489-501; ROA.558-559.
[14] ROA.1208-1217; ROA.1262-1272; ROA.1308-1309; ROA.1643-1644.

27. Yan objected to both. The district court denied the first objection and, in the latter ruling, imposed a *sua sponte* pre-filing injunction on Yan.[15]

28. Yan's motion for reconsideration (ROA.1675) was denied.

Statement of Facts

29. On March 13, 2022, Barrows filed a motion seeking interim attorney's fees. The motion was supported by a fee affidavit and billing records stating that fees had been incurred in the divorce suit. Those documents are identified below in Table 2 as the Billing-Records-Affidavit and the $11,000-Billing-Record. Yan alleged that the submission also included fees from criminal case E0129990-1, and that the billing records showed Barrows was owed only approximately $11,000 after prior payments as of March 2, 2022. That means the $25,000 awarded to Barrows on April 13 was more than double the documented amount, while another $25,000 was awarded to Pigg without any fee petition at all. ROA.1157-1159; ROA.1163-1178; ROA.1070.

30. Pigg appeared as Yan's counsel at the hearing, but Yan alleged that Pigg did not file a pleading seeking attorney's fees and did not testify or present evidence in support of such a request. ROA.1070 [¶70].

---

[15] ROA.1310-1314; ROA.1645-1653; ROA.1544; ROA.1667-1674.

31. On April 13, 2022, DeAngelis rendered a temporary QDRO-type order directing Yan, as the plan participant and source of the funds—not as the recipient—to withdraw $50,000 from his 401(k), with $25,000 designated for Barrows's attorney's fees and $25,000 designated for Pigg's attorney's fees. Yan alleged that the amount designated for Barrows included unearned prepayment and fees from a criminal case in which Yan was not a party, and that neither counsel had filed a statutorily required QDRO petition by that date. ROA.1141; ROA.1070; ROA.1065-1068.

32. On April 26 and May 26, 2022, Barrows, Ybarra, and Pigg signed two temporary QDROs submitted for signature. Yan alleged that the orders were altered to state that an April 13 hearing had been held on spousal support and that $25,000 would be designated as spousal support to Fuyan Wang, with disbursement supervised by Barrows. ROA.1143-1145; ROA.1077-1081.

33. After the April 26 and May 26, 2022 QDROs were prepared and signed, Barrows, Ybarra, Pigg, and U.S. Bank used mail and email communications with one another and with the court in carrying out the challenged QDRO-related conduct. ROA.1070-1071 [¶¶ 69-74]; ROA.1075-1081 [¶¶ 87-108].

34. On July 21, 2022, after U.S. Bank contacted Yan regarding the May 26 order, Pigg emailed Yan stating that Yan had been ordered at the April hearing to withdraw $50,000 from his 401(k), with $25,000 to be paid to Barrows and $25,000 to Pigg.

The complaint separately alleged that Pigg did not file a fee pleading or present fee evidence. On Yan's theory, that sequence showed no ordinary fee-evidence basis for the extraction, yet a direct court-ordered payment obligation asserted by the legal-service provider himself. ROA.1070; ROA.1079; ROA.1201.

35. Yan alleged that Pigg also represented that he had not signed the altered May 26 QDRO. Yan also alleged that, despite that statement, Pigg had in fact signed the May 26 order twice. ROA.1080-1081; ROA.1081; ROA.1143-1145.

36. On July 21, 2022, Pigg sent Yan's objection letter to U.S. Bank (ROA.2030-2031), asserting that no spousal-support hearing had occurred on April 13 and that his funds were protected by procedural due process. Yan attached a copy of the April 13 order to support his objection.

37. On August 1, 2022, U.S. Bank responded that the May 26 order was "in direct conflict" with the April 13 order. U.S. Bank nevertheless took the position that the May 26 order was "in addition to, and separate from" the April 13 order. Yan alleged that U.S. Bank diverted the funds in September 2022 despite his objection. ROA.2034-2035.

38. On August 5, 2022, after learning that Yan had objected, Barrows and Ybarra emailed Pigg, stating: "In order for us to obtain our attorney's fee, we must say the order is for spousal support…," and "there is no way around it." ROA.1139.

39. On August 7, 2022, Pigg emailed Yan: "at the hearing in April, you were ordered to get 50K from your 401(k)… Leslie tried to get her $25k via a QDRO, claiming it was for spousal support – not attorney's fees as ordered. I did not sign off on that [May 26] QDRO because it would not be true and I am not going to sign a [May 26] court document that is not true." ROA.1140.

40. On August 8, 2022, Pigg emailed Yan: "the legal issue is that we either have to lie and accept the QDRO…" Yan further alleged that, notwithstanding that statement, Pigg later approved or accepted the QDRO process on August 29, 2022. ROA.1141.

41. Yan also alleged that Barrows, Ybarra, and Pigg pressured him to sign a divorce settlement and attempted to keep the challenged conduct concealed, and that within 48 hours Pigg withdrew from representing Yan, thereby hindering Yan's efforts to expose the conduct. ROA.1071 [¶74]; ROA.1081 [¶108]; ROA.1099 [¶179]; ROA.1119 [¶323].

42. On August 29, 2022, Yan alleged that, more than 135 days after rendition of the temporary order, Barrows and DeAngelis sought to "clarify" the prior ruling regarding attorney's fees, and that Pigg coordinated with Barrows regarding approval of the ERISA-fund disbursement. Yan further alleged that Texas law did not authorize an associate court to re-clarify its temporary order at that time. ROA.1213; ROA.1065-1068.

43. Marin and Martinez dismissed Yan's grievances against Barrows and Pigg. Yan appealed both dismissals to the Board of Disciplinary Appeals ("BODA"). ROA.1081-1084; ROA.1081-1086.

44. Yan alleged that BODA reversed both classification decisions. He further alleged that BODA reversed only 6.1% of classification appeals in 2022-2023, yet Craig later dismissed both matters, and that Disciplinary Defendants were aware of Barrows's email communications and thereafter participated in dismissing or concealing the grievances arising from the altered-QDRO allegations. Those reversals matter at the pleading stage because BODA is a statewide disciplinary appellate body appointed by the Supreme Court of Texas, independent of the local actors whose conduct Yan challenged. BODA reviewed the grievances as filed and with no other information, then found possible violations sufficient to require investigation—Rule 4.01(a) as to Barrows and Rule 1.05(b) as to Pigg. ROA.1084-1086; ROA.1084 [¶120]; ROA.1095 [¶166]; ROA.1097 [¶171].

45. Yan alleged that the Tarrant County District Attorney's Office and Sheriff's Office declined to pursue the conduct he reported. Yan also cited materials reflecting that Missouri authorities have prosecuted offenses under 18 U.S.C. § 664, while Texas authorities, including in Tarrant County, did not pursue the conduct he reported. On Yan's theory, that discretionary nonaction formed part of the broader local institutional backdrop that enabled ongoing concealment and damage control

to preserve the unlawful diversion, keep the wrongfully diverted plan assets in the hands of the recipients, and impede correction or recovery. ROA.1084 [¶121]; ROA.1977 [¶6]; ROA.1501; ROA.1975; ROA.1982-1983.

46.     Yan also alleged that the events in his case reflected a broader, statewide, decade-long pattern in Texas family-court proceedings of using temporary QDRO-related orders and domestic-relations labels to direct ERISA-protected retirement funds toward attorney's fees. The PFAC identified concrete examples: a 2009 Travis County proposed order seeking 401(k)-sourced interim fees; a 2011-2012 Tarrant County sequence requesting $30,000 from an American Airlines SuperSaver 401(k), appointing a receiver, authorizing $61,700 from the ERISA account, and directing 401(k) proceeds to attorney fees; and the 2014 Tarrant County 360-549246 matter directing $12,000 from a 401(k), including $6,000 to counsel's IOLTA, followed by an interlocutory DRO. ROA.2717-2719; ROA.2726-2727. Those allegations supplied pleaded continuity and relatedness; the district court never analyzed them.

47.     Yan further alleged that SBTX's grievance system was used to protect attorneys and judges involved in the underlying conduct. According to the complaint, Disciplinary Defendants, and SBTX knew of the altered QDRO and related allegations but still dismissed the grievances. (ROA.1083-1085 [¶¶ 118-124]).

48. Yan also alleged that SBTX and the Firm benefited from unlawful QDRO transfers, that proceeds derived in part from the challenged conduct flowed back into the system, and that SBTX used attorney-paid fees and related funds to operate the disciplinary apparatus in a manner that, on Yan's theory, helped preserve the enterprise and its grievance-protection function. ROA.1086-1087 [¶¶127-133]; ROA.1090-1092 [¶¶149-159].

49. The factual core was documentary, not speculative. Table 2 identifies the key records showing post-hearing proposed-order relabeling, knowing participation, and distribution despite notice of conflict. ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

50. The complaint attached the following key documents as Exhibit 1, Exhibits 3/5, or attached court orders. This brief uses short document handles to avoid repeated quotation. The full language remains available in the cited ROA pages. ROA.1077-1081; ROA.1136; ROA.1139-1142.

51. The Spousal-Support Email, Would-Not-Be-True Email, and Have-to-Lie Email are supported by ROA.1079-1080; later references use those handles to avoid repeated quotation.

Table 2: Documented Factual Core

| Handle | Document / Date / Parties | ROA & Exhibit |
|--------|--------------------------|---------------|

| | | |
|---|---|---|
| **Spousal-Support-Email** | Barrows → Pigg (Ybarra CC'd) Aug. 5, 2022 | ROA.1079 Exhibit 1 |
| **"Would Not Be True"-Email** | Pigg → Yan Aug. 7, 2022 | ROA.1079 Exhibit 1 |
| **"Have to Lie"-Email** | Pigg → Yan Aug. 8, 2022 | ROA.1080 Exhibit 1 |
| **Conflict-Acknowledgment** | U.S. Bank → Yan Aug. 1, 2022 | ROA.2034-2035 |
| **Five Instruments** | Sequential diversion documents Apr. 13 – Aug. 29, 2022 | ROA.1136; ROA.1139-1142; ROA.1213; ROA.2030-2035 |
| **The-Pattern-Orders** | Six additional Texas family-court QDRO-type orders 2009 – 2022 | ROA.1085; ROA.2726-2727 Exhibit 9 / Pattern-predicate table |
| **Billing-Records-Affidavit** | Barrows fee affidavit + billing records Filed Mar. 3, 2022 (Feb. 1, 2022 entry) Barrows testified Apr. 13 all fees were family-court fees | ROA.1100; ROA.1163 |
| **$11,000-Billing-Record** | Same billing records As of Mar. 2, 2022 | ROA.1161-1163 Exhibit 3 |
| **November-2021-Order** | DeAngelis fee order Nov. 10, 2021 (Barrows contributed to DeAngelis campaign two weeks prior) | ROA.1073-1074; ROA.2702 |
| **Campaign-Connection** | DeAngelis official campaign social media Oct. 27, 2021 (Two weeks before Nov. 2021 Order) | ROA.1073-1074; ROA.2702 |
| **Marital-Status-Falsification** | U.S. Bank internal record change ~2022 | ROA.1131 [¶411] |
| **Pigg-Double-Payment** | Pigg → Yan email + Yan's out-of-pocket payment Jul. 21, 2022 + subsequent | ROA.1080-1081 Exhibit 1 |

## Summary of the Argument

52.     This appeal turns on a small number of clean legal errors. Rule 12 required the district court to test the complaint Yan pleaded. Instead, the court substituted a different case: ERISA-plan diversion became divorce dissatisfaction; 18 U.S.C. § 664 plan-asset conversion became § 1956 money laundering; and a Sherman Act § 2 consumer-monopoly theory became a § 1-style competitor dispute, as summarized in Table 3. Each substitution changed the elements, the injury, and the available relief. ROA.2078-2095; ROA.2981-2992.

53. The ERISA premise controls. The complaint identified protected 401(k) assets, non-alternate-payee attorney-fee recipients, a fabricated spousal-support label, conflicting QDRO-type paperwork, and distribution after U.S. Bank acknowledged a direct conflict. ERISA's anti-alienation rule and QDRO limits do not turn on local labels. A private attorney-fee debt cannot become a qualified ERISA support payment merely because later paperwork calls it support.[16]

54. *Younger* fails at the gateway. *Sprint* requires a state proceeding to fit one of three exceptional categories before *Middlesex* considerations matter. The district court cited ongoing proceedings, Texas family-law interests, and state remedies, but identified no *Sprint* category. See *Texas Entertainment*. Even if abstention applied, dismissal with prejudice was not an abstention remedy; *Quackenbush* and *Deakins* require deferral, not a merits termination. ROA.2085 n.3, 2078-2095.

55. The amendment rulings also require vacatur. The court counted technical, court-compelled amendments as merits opportunities, imposed Doc. 58's extra-textual amendment lock before the dispositive defects were identified, and then denied the first real post-remand merits amendment by measuring futility against the superseded TAC rather than the PFAC and Wang affidavit.[17]

---

[16] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.
[17] ROA.560; ROA.2972-2973; ROA.2981; ROA.2990-2992; ROA.3023-3026.

56.     The DeAngelis dismissal contains an independent reversible error. The court's immunity analysis relied on *McKinley v. Abbott* [18] for a judicial-immunity proposition that *McKinley* does not contain. *McKinley* addressed the Eleventh Amendment bar to state-law claims against the Texas Attorney General. That verifiable factual error appeared in the Pittman Decisions' own de novo review order and cannot support affirmance. It was not a judicial-immunity case and did not authorize blanket immunity for the alleged pre-decree QDRO-type conduct challenged here. The complaint also alleged the absence of Chapter 9 authority, no QDRO petition, no support pleading, and no lawful ERISA path, triggering the function-specific analysis required by *Stump* and *Forrester*.[19]

57.     The state-law immunity premise is independently wrong. The district court invoked Tex. Fam. Code § 201.017, which gives an associate judge only "the judicial immunity of a district judge." That benchmark matters because Texas district judges are not absolutely immune from every suit merely because the challenged conduct occurred in a case. Tex. Civ. Prac. & Rem. Code § 30.017 expressly recognizes judge-directed claims when they are sworn, are not based solely on rulings, and plead specific facts supporting each element beyond the rulings. Section 201.017 therefore could not give DeAngelis broader immunity than a district judge would have under

---

[18] *McKinley*, 643 F.3d at 406.
[19] ROA.2081-2082; ROA.1042-1044; ROA.1065-1070; ROA.1141.

Texas law. Yan pleaded facts beyond ruling dissatisfaction—non-QDRO routing, absence of Chapter 9 authority, altered post-hearing paperwork, fabricated support labeling, and movement of ERISA assets to non-alternate-payee attorneys. The district court skipped the state-law benchmark and the federal function-by-function inquiry.

58. The defendant-specific dismissals repeat the same problem. The SBTX Defendants were sued for post-notice shielding and enforcement connection, not because Yan was a disciplinary respondent or sought review of a grievance judgment. Barrows, Ybarra, and Pigg were alleged to have participated in false-fee proof, altered-order conduct, and spousal-support relabeling beyond ordinary advocacy. Pigg, after remand, still received no true Pigg-specific Rule 12(c) analysis.[20]

59. The U.S. Bank issue is now statutory and simple. Section 1056(d)(3)(H)(i) required separate accounting and withholding while qualified status was being determined. U.S. Bank's own written acknowledgment that the May 26 order appeared in direct conflict with the April 13 order established that the qualification issue was unresolved. U.S. Bank did not segregate; it distributed. That states an

---

[20] ROA.1083-1086; ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.2981-2992.

ERISA statutory-process violation independent of the harder § 1983 fallback. ROA.2034-2035.

60.    The RICO ruling should be vacated because the court analyzed the wrong predicate and the wrong conspiracy standard. Yan pleaded § 664 plan-asset conversion through a five-instrument chain. The court analyzed § 1956 laundering. And under *Salinas* and *Elliott*, a § 1962(d) conspirator need not personally commit two predicate acts or independently plead a full pattern; the question is agreement to further the enterprise's unlawful objective.[21]

61.    Finally, the sanctions and pre-filing injunction fail under *Qureshi*. The only warning concerned future frivolous sanctions motions, but no later sanctions motion was filed before the injunction. The injunction instead rested on objections and issue-preserving filings. The Court should vacate the judgment, amendment denials, sanctions, and pre-filing injunction, and remand for fresh review before a different Article III judge and, if referred, a different magistrate judge. ROA.1079; ROA.1667-1674.

---

[21] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2078-2095.

## Standard of Review

62.     Dismissals under Rules 12(b)(6) and 12(c), legal conclusions regarding ERISA, RICO, antitrust, immunity, and *Younger*, and the interpretation of federal statutes are reviewed *de novo*. The Court accepts well-pleaded facts and attached documents favorable to the plaintiff, but it does not accept a district court's substitution of a different legal theory or source of injury.

63.     Rule 12(b)(1) dismissals are reviewed *de novo* when they turn on legal conclusions. *Younger* abstention is reviewed *de novo* because it determines whether the federal court may proceed. *Sprint*'s category requirement is a legal gateway.

64.     Denial of leave to amend is reviewed for abuse of discretion, but futility is reviewed under the same *de novo* standard that governs Rule 12. A court abuses its discretion when it applies the wrong legal standard, relies on an erroneous view of the record, counts non-merits amendments as cure opportunities, or measures futility against the wrong pleading.

65.     Sanctions and pre-filing injunctions are reviewed for abuse of discretion, but the existence of notice, hearing, and an adequate legal basis is reviewed rigorously because access restrictions implicate due process. A court necessarily abuses its discretion when it imposes a litigation restriction without the process required by *Qureshi*.

66.    Reassignment is governed by 28 U.S.C. § 2106 and the *Corrugated Container* factors. The Court asks whether the original judge would have difficulty putting aside previously expressed views, whether reassignment preserves the appearance of justice, and whether reassignment would entail waste or duplication out of proportion to the benefit. The § 636(b)(1) *de novo*-review obligation is a legal requirement.

Argument and Authorities

I. The district court dismissed a substituted case, not Yan's ERISA case; this global error independently requires vacatur.

67.    Section I gives this Court the shortest path to decision. The district court did not premise on the ERISA-centered injury Yan pleaded. The dismissal roadmap had two order chains: Doc. 121 supplied the first FCR against all moving defendants except Pigg; Doc. 148 adopted that FCR, added U.S. Bank, and purported to dismiss the case; and Doc. 214 completed the omitted Pigg piece by incorporating Doc. 148's prior RICO/antitrust reasoning and denying amendment. Doc. 224 adopted Doc. 214 without independent explanation, and Doc. 225 entered final judgment. The error began from a substituted domestic-relations premise and then carried that premise through standing, *Younger*, immunity, Rule 12(b)(6), Rule 12(c), and amendment.[22]

---

[22] ROA.1682-1699; ROA.2078-2096; ROA.2981-2992; ROA.3064-3065.

53

If that operative premise was invisible, the judgment cannot stand. The defendant-specific sections that follow preserve additional errors and show why the premise error mattered, but this Court need not resolve every defendant-specific issue to vacate and remand.

68. Although the challenged events occurred in a divorce proceeding, the complaint does not ask this Court to review a divorce, custody, or property decree. It asks whether the district court bypassed federal ERISA protections and Rule 12 standards by treating alleged deceptive conduct—false fee proof, altered QDRO-type papers, and a fabricated "spousal support" label used to divert protected retirement assets through a non-QDRO mechanism—as a domestic-relations grievance.

A. The threshold rulings rest on a substituted premise because ERISA, not domestic-relations labeling, controls the alleged non-QDRO transfer of retirement assets to attorney-fee claimants (Issues 1–2).

69. The premise error begins even before ERISA. At Rule 12, the district court had to accept the pleaded and exhibit-supported allegation that the court orders were altered after the April 13 rendition to convert attorney-fee awards into "spousal support." That allegation was not peripheral. ERISA § 514(a) preempts state laws that "relate to" employee benefit plans; no domestic-relations label overrides that

preemption where the order fails ERISA's QDRO requirements.[23] Judicial immunity, attorney immunity, *Younger*, the "single lawful transaction" theory for U.S. Bank, and the replacement of "ERISA" with "launder money" each depended on treating the later papers as genuine state-court instruments rather than as the pleaded mechanism of diversion. ROA.2082. ROA.2091. ROA.2093. ROA.2122-2124. Because the court could not assume genuineness against the complaint and attached exhibits at Rule 12, the alteration premise supplies a global reason to vacate the threshold dismissals. The certified records make the substitution concrete. The April 13 Associate Judge's Report reflects a hearing and ruling on interim attorney's fees: $25,000 to Barrows and $25,000 to Pigg from Yan's 401(k). The April 26 QDRO-type order then recites that the April 13 hearing was on "Respondent's request for Spousal Support." Those records cannot both describe the same hearing accurately. At Rule 12 and Rule 15, the court had to credit the complaint's allegation that the later "spousal support" recital was false and inserted to reach ERISA-protected assets that could not lawfully be reached for attorney's fees. It instead treated the later label as a genuine support adjudication and built standing, immunity, *Younger*, RICO, antitrust, and ERISA conclusions on that assumed fact. [24] ROA.1185. ROA.1200.

---

[23] *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983); 29 U.S.C. § 1144(a).
[24] ROA.1070; ROA.1077-1081; ROA.1136; ROA.1139-1142.

70.     The district court's premise substitution had three legal consequences. First, it displaced the ERISA framework. Second, it distorted the standing and abstention analysis. Third, it caused the court to evaluate a recast controversy rather than the pleaded one. Doc. 148's operative analysis of Claims 1 through 8 spans ROA.2079–2091. That analysis does not contain the words "ERISA," "pension fund," or "QDRO"; nor does it cite 18 U.S.C. § 664 or § 1962. ROA.2079–2091. That omission was central.

71.     That severed link was not accidental—it was the product of a wrong premise. The complaint did not plead one undifferentiated grievance about a divorce case. It pleaded an ERISA-centered federal case: a protected retirement plan, a concrete financial loss to that plan, an alleged diversion of plan assets through conduct incorporating 18 U.S.C. § 664, and requests for at least 20 declaratory, injunctive, and monetary reliefs under federal law. ROA.1099-1102.

72.     As the Supreme Court recently emphasized in rejecting an erroneous litigation premise: "But that choice, unanimous as it has been, cannot now control."[25]

---

[25] *Moody*, 603 U.S. at 726; see also *NetChoice*, 121 F.4th at 498 (on remand from *Moody*, identifying a district court's acceptance of one party's framing—addressing only "heartland applications" rather than the full case as presented—as "the precise error the Supreme Court identified in *Moody*," requiring vacatur and remand).

73.     The Pittman Decisions were even worse than *Moody*, because the district court completely omitted heartland ERISA from the premise itself. That omission was not peripheral. The district court then carried that same error forward by recasting an ERISA-centered federal case as a generic domestic dispute, much as Pigg's Rule 12(c) motion had urged. ROA.2078-2095; ROA.2981-2992.

74.     The consequences extend beyond one litigant. The complaint alleges injuries cognizable under 18 U.S.C. § 1964 arising from a broader, statewide, decade-long pattern of using court process to divert ERISA-protected assets. The complaint also alleges a two-tier scheme: Attorney Defendants, DeAngelis, and U.S. Bank formed the extraction tier: they moved the funds. SBTX Defendants formed the shielding tier: they allegedly protected the channel after exposure.[26]

75.     Recasting that structure as a divorce dispute obscured not only the underlying ERISA injury, but also the structural reason the complaint says no effective state corrective process was available: the state machinery itself was alleged to have been repurposed as the enterprise's protection mechanism. Dismissing the action without engaging that ERISA premise did not merely reject one plaintiff's theory. It foreclosed adjudication of whether the alleged mechanism, assumed true at this

---

[26] ROA.1083-1086; ROA.1090-1092; ROA.2187.

57

stage, violates federal protections enacted to shield retirement assets from unlawful alienation. ROA.1083-1086; ROA.2078-2095.

76.     That broader consequence is amplified by the setting. The complaint alleges that attorney's fees were relabeled as spousal support in a state-monopolized domestic-relations forum, where temporary orders may affect property and ordinary interlocutory review is prohibited. That relabeling is not a minor wording dispute. It is the pleaded ERISA-bypass mechanism. The April 13 order allegedly directed retirement funds to private attorney-fee claimants. It did not adjudicate spousal support, did not identify those attorneys as statutory alternate payees, and did not arise from a pleaded and heard support claim. The later QDRO-type papers allegedly inserted the "spousal support" label because the protected 401(k) funds could not otherwise be reached for attorney's fees.[27]

77.     The district court's domestic-relations framing therefore assumed away the decisive fact. If the "spousal support" label reflected a genuine support adjudication payable to a statutory alternate payee, defendants could invoke ERISA's QDRO exception. But Yan pleaded the opposite: after the hearing, officers of the court used materially altered proposed QDRO-type papers to procure signatures on documents that recast attorney-fee extraction as spousal support, even though the private

[27] ROA.1070; ROA.1077-1081; ROA.1136; ROA.1139-1142.

attorney-fee claimants were not alternate payees under 29 U.S.C. § 1056(d)(3)(K). At Rule 12, the court had to accept that pleaded sequence and could not treat the label as valid merely because it appeared on a signed paper. The defect was not absence of a signature; it was alleged fraud in procurement plus lack of lawful ERISA/QDRO authority. Whether the proposed QDRO-type language was materially altered from the April 13 ruling was a pleaded factual issue, not a legal presumption the district court could resolve against the complaint at Rule 12.[28]

78. That label alteration also explains why the injury is federal. The injury is not that Yan disliked a divorce ruling. The injury is that ERISA-protected retirement assets were allegedly moved through a paper label that converted private attorney-fee claims into apparent support obligations without the statutory QDRO predicates ERISA requires. Once that pleaded relabeling is credited, the case falls inside ERISA's anti-alienation and remedial framework, not outside federal jurisdiction as a domestic-relations dispute.[29]

79. A judicial signature obtained through materially false proposed-order language does not end the legal inquiry. At most, it creates an order subject to direct attack for fraud in procurement; and where the altered language creates relief the

---

[28] ROA.1077-1081; ROA.1136; ROA.1139-1142.
[29] ROA.1077-1081; ROA.1136; ROA.1139-1142.

court lacked statutory authority to grant or ERISA does not recognize, the order cannot create lawful force for that unauthorized purpose.[30] More importantly, the altered label could not create QDRO force if the order exceeded Texas domestic-relations authority or failed ERISA's statutory QDRO requirements.[31] Thus, accepting the pleaded facts as true, the judge's signature did not make the altered "spousal support" label legally effective for defeating ERISA's anti-alienation rule. A signature is not a universal solvent: it may make the paper an order, but it does not make private attorney-fee claimants statutory alternate payees, does not make an unpleaded support label a genuine support adjudication, and does not create QDRO force beyond Texas and ERISA authority.

80.    The issue is not whether the state court entered a merely wrong order; it is whether the later signed paper could function as a lawful QDRO when the complaint pleaded that the QDRO-type language was materially altered to create a support label never pleaded, heard, or recognized by ERISA. The complaint does not merely allege state-law error; it alleges that the state-law framework, if actually followed, would have prevented the ERISA diversion.[32]

---

[30] *PNS Stores, Inc. v. Rivera*, 379 S.W.3d 267, 274–77 (Tex. 2012); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–47 (1944).
[31] *Dalton v. Dalton*, 551 S.W.3d 126, 141–42 (Tex. 2018).
[32] ROA.1065-1070; ROA.1077-1081; ROA.1136; ROA.1139-1142.

81.     If a pleaded diversion of ERISA-protected assets can be redescribed as mere dissatisfaction with divorce rulings, the same forum features that make the alleged practice difficult to arrest at the front end also make it harder to expose, correct, or even identify. And because the complaint alleges a statewide, decade-long pattern rather than a one-off event, treating such allegations as merely domestic risks insulating an allegedly repeatable mechanism from meaningful scrutiny. Congress's protection of retirement assets serves a public end, not merely a private one.[33]

82.     That *substituted* premise then shaped the rest of the analysis. A pleaded diversion of ERISA-protected 401(k) assets through conduct incorporating *18 U.S.C. § 664* was recast as a routine disagreement over funds under Yan's control and dissatisfaction with state-court divorce outcomes. That substitution was harmful for a further reason that stands even if this Court were to accept the domestic-relations framing: *§ 664 independently* protects employee-benefit-plan assets from *unlawful* diversion regardless of the surrounding state-court setting. The wrong-premise error therefore did not merely mislabel the dispute. It made the predicate acts analytically invisible before the Rule 12 analysis began. See Section II.E, *infra*.

83.     The later standing, abstention, immunity, and Rule 12 analyses therefore proceeded from a substituted controversy rather than the one the complaint actually

---

[33] ROA.1077-1081; ROA.1083-1086; ROA.2078-2095.

pleaded. The analysis therefore had to begin from ERISA's own protections and remedies, not from a domestic-relations recharacterization. ROA.1070-1081; ROA.2078-2095.

*1. ERISA preemption and § 1132(a)(3) prospective relief supplied the governing federal premise for enforcing ERISA's anti-alienation protections*

84.     ERISA preemption and § 1132(a)(3) prospective relief supplied the governing federal premise because Congress reserved to federal courts the authority to enforce ERISA's anti-alienation protections against the conduct alleged here. The domestic-relations exception has no application here. *Ankenbrandt* held that the exception "encompasses only cases involving the issuance of a divorce, alimony, or child custody decree."[34] Yan does not ask this Court to issue any such decree. He asks for ERISA restoration, RICO damages, and § 1983 relief for an alleged conversion of 401(k) assets.[35] *Marshall* confirmed the exception is that narrow and no broader.[36]

85.     That narrow jurisdictional rule is different from ERISA's separate statutory treatment of support-related pension distributions. ERISA's default rule is anti-alienation: pension benefits "may not be assigned or alienated." *29 U.S.C. § 1056(d)(1)*. Congress then created a limited statutory carveout for a qualified

---

[34] *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992).
[35] ROA.1–33; ROA.1053–1055; ROA.1100; ROA.1129–1132.
[36] *Marshall v. Marshall*, 547 U.S. 293, 307–08 (2006).

domestic relations order, and it defined a domestic relations order as a state judgment, decree, or order that relates to "child support, alimony payments, or marital property rights" for a spouse, former spouse, child, or other dependent. *29 U.S.C. § 1056(d)(3)(B)(ii).*

86.  ERISA therefore reaches support-related pension distributions only because Congress expressly said so, and only on the terms Congress specified. So even taking the most favorable label for defendants, the relevant statutory path would be spousal support, not a lawyer's private fee claim arising from *criminal* proceedings. On Yan's allegations, that statutory mismatch is especially stark: ERISA provides no lawful mechanism for diverting a victim's pension assets to pay the perpetrator's *criminal* defense counsel Ybarra.

87.  The fund at issue was Yan's Minnesota 401(k), and whether Texas process could reach that ERISA-protected account at all was a federal preemption question, not merely a domestic-relations labeling dispute. The district court never applied ERISA's anti-alienation and QDRO framework. Instead, it reduced the pleaded ERISA-protected plan interest to "certain funds under his control." Yan alleged injury to ERISA-protected retirement-plan assets, not merely "certain funds under

his control." The Decisions bypassed the ERISA-preemption question by recasting the pleaded plan-asset injury as domestic-relations dissatisfaction.[37]

88. What Yan challenges is not a spousal-support decree. He was not divorced. The complaint alleged a transfer of ERISA assets without a QDRO petition, support pleading, support hearing, or final-decree Chapter 9 process. He challenges the alleged laundering of a private attorney-fee claim through nonappealable state domestic-relations vehicle to reach ERISA-protected retirement assets. That is where defendants' theory breaks down. ERISA does not authorize pension distributions to opposing counsel simply because someone attached a domestic-relations label to the paper. The statute limits the permissible recipient to an "alternate payee," and an alternate payee must be a "spouse, former spouse, child, or other dependent" of the participant. 29 U.S.C. § 1056(d)(3)(K). Opposing counsel is none of those. So a private attorney-fee demand does not become ERISA-payable merely by being repackaged as a DRO or QDRO.

89. On Yan's allegations, Barrows's fee demand was not spousal support payable to a spouse or former spouse, but Barrows's own claim for fees; if so, that claim falls outside ERISA's narrow statutory exception even before one reaches the merits of how the order was labeled. Texas Family Code Chapter 9 further confirms that no

---

[37] ROA.1070; ROA.1141; ROA.2034-2035; ROA.2078-2095.

decree-based spousal entitlement to this fund existed at the time of the April 13, 2022 order. See Section I.B.3, infra.[38]

90.    The Fifth Circuit's jurisdictional rule points the same way. In *United States v. Bailey*, the court held that the domestic-relations exception "has no application" where there is an independent basis for federal jurisdiction, because the exception derives from the diversity jurisdiction statute.[39] If the exception does not bar a federal-question case merely because the underlying order has a family-law character, then a federal ERISA challenge alleging diversion of pension assets to satisfy opposing counsel's private fee demand is not barred by the domestic-relations exception.

91.    The complaint further tied that fund loss to the federal wrong it actually pleaded. The RICO theory did not rest on a generic allegation of "launder[ing] money." It alleged, inter alia, theft or embezzlement from an employee benefit plan under 18 U.S.C. § 664—that is, wrongful diversion of assets from an ERISA-protected retirement plan. ROA.1070–1071; ROA.1118–1132.

92.    Once ERISA is restored to the premise, the source of injury, source of law, and source of relief align. The injury was the loss of ERISA-protected plan assets.

---

[38] ROA.1070; ROA.1077-1081; ROA.1136; ROA.1139-1142.
[39] *United States v. Bailey*, 115 F.3d 1222, 1231 (5th Cir. 1997).

The pleaded federal wrong was diversion of those plan assets, including through §

664-incorporated racketeering allegations. And ERISA itself supplied a distinctive

federal remedial scheme: a participant or beneficiary may sue to enjoin acts or

practices that violate ERISA or the plan and to obtain other appropriate equitable

relief, with exclusive federal jurisdiction except for actions under 29 U.S.C. §

1132(a)(1)(B). See 29 U.S.C. § 1132(a)(3), (e)(1).

93.    The complaint's prayer followed that same ERISA-centered path. It sought

declaratory relief, injunctive relief, damages, and related matters, and it specifically

requested statewide audit, victim identification, notice, reimbursement, and

injunctions to halt continuing misconduct. Those requests were not incidental. They

were part of the relief structure Yan pleaded from the outset. ROA.1087-1092;

ROA.1100.

94.    Yan also preserved that same point in the district court arguments and prior

Fifth Circuit brief. He argued that the Decisions ignored pleaded ERISA prospective

relief, including the request to "identify all the victims" and "inform every one of

them," and presented that notice request as part of the forward-looking equitable

relief already pleaded. The premise was thus pleaded, briefed, and argued, not invented on appeal.[40]

*2. ERISA's anti-alienation rule required the court to treat the diverted 401(k) funds as protected plan assets; the label "spousal support" cannot convert a private attorney-fee demand into a lawful QDRO payable to opposing counsel*

95. Fifth Circuit law supplies the minimum remedial bridge once the case is restored to its ERISA premise. In *E-Sys., Inc. v. Pogue*,[41] the Court held: "The State received monies from the ERISA plans to which it was not entitled. The funds must be returned. The parties are to be restored to the status quo ante." The Court added that relief includes "appropriate consideration of the loss of use of the funds for the period involved." That restoration is the minimum equitable remedy for wrongful diversion of ERISA-plan monies, not the limit of relief available under the parallel federal causes of action pleaded here. Fees allegedly obtained from ERISA-protected plan assets through an unlawful non-QDRO mechanism should be restored to the status quo ante.

96. The restoration claim is equitable, not legal, under the Supreme Court's framework. In *Great-West Life & Annuity Ins. Co. v. Knudson*,[42] the Court distinguished a legal claim for money owed generally from an equitable claim

---

[40] ROA.1087-1092; ROA.1704-1707; ROA.2384-2386.
[41] *E-Sys., Inc. v. Pogue*, 929 F.2d 1100, 1104 (5th Cir. 1991).
[42] *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14 (2002).

seeking particular funds or property in the defendant's possession. In *Sereboff* v. Mid Atl. Med. Servs., Inc.,[43] the Court held that § 1132(a)(3) permits equitable relief when the plaintiff seeks specifically identifiable funds within the defendant's possession or control. Here, the complaint identifies a specific ERISA fund—Yan's Minnesota 401(k)—and specific diverted amounts, $25,000 and $25,000, within RICO Defendants' possession or control. This is not a claim for money in the abstract. It is a claim to restore specifically identified plan monies allegedly diverted through unlawful process.

97.    The complaint also pleaded later acts of concealment, institutional shielding, and continued nonreturn of the funds. Those later acts matter not as a substitute for the original ERISA injury, but as allegations that the same deprivation was prolonged and that prospective ERISA relief, including audit, notice, and injunctive measures, remained necessary. ROA.1083-1087; ROA.1090-1092.

98.    The restoration theory is also defendant-specific. The complaint does not seek undifferentiated monetary relief from all appellees. It alleges direct receipt as to Barrows and claimed entitlement or designation as payee as to Pigg, who were each designated to receive $25,000 from the 401(k). Those allegations, if proved, support restoration from the alleged recipients and prospective equitable relief against the

---

[43] *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 362–63 (2006).

entity that carried the transfer forward after notice. See *E-Systems*, 929 F.2d at 1104; 29 U.S.C. § 1132(a)(3).

99.  The analysis therefore should have begun not from a generalized domestic-relations narrative, but from ERISA's own rules governing protected plan assets and the remedies available when those assets are wrongfully diverted. That includes not only prospective equitable measures to halt ongoing violations, but also restoration of unlawfully extracted plan funds to return the parties to the *status quo ante*.

**B. *Younger* abstention cannot stand because the district court skipped *Sprint*'s gatekeeping step, dismissed with prejudice instead of deferring, and ignored ERISA's preemptive federal remedial path (Issues 3-4).**

> Yan does not seek appellate review of a state-court judgment; he challenges defendants' own ERISA-fund diversion and shielding conduct. Federal law loses force if an alleged ERISA-fund diversion can be insulated merely by calling the paper trail a state-court proceeding. The state-proceeding label does not exempt a pleaded federal claim alleging protected-plan diversion through § 664 predicate acts. The Pittman Decisions did not apply *Nesses* or any source-of-injury analysis to distinguish an independent federal injury claim from a forbidden appeal of a state judgment, even though Yan raised that distinction in his FCR objections and supplemental objections, the attorney defendants joined issue on it, and Yan renewed the same point after remand.[44]

*1. The district court never identified a Sprint category; Middlesex cannot supply the missing gateway.*

> The Pittman Decisions' alternative *Younger* footnote repeats the error *Sprint* rejected. The court reasoned that abstention was "clearly appropriate"

---

[44] ROA.1704-1707; ROA.1727-1728; ROA.1741-1742; ROA.2384-2386.

because the divorce dispute remained ongoing, implicated Texas family-law interests, and gave Yan state-court avenues to raise challenges. ROA.2085 n.3. That treated the old *Middlesex* considerations as an independent abstention test. They are not. *Sprint* holds that *Younger* applies only after the state proceeding first fits one of three exceptional categories: an ongoing criminal prosecution, a civil enforcement proceeding akin to a criminal prosecution, or a civil proceeding involving orders uniquely in furtherance of the state court's ability to perform its judicial functions.[45] No such category was identified here.

Categories 1 and 2 plainly do not apply. Category 3 is narrow and process-specific; it does not convert every state-court order into a *Younger*-protected proceeding merely because a state court signed it.[46] Ordinary divorce orders, private fee disputes, post-notice disciplinary shielding, and ERISA-plan distribution conduct are not criminal prosecutions, State-initiated enforcement proceedings, contempt proceedings, supersedeas-bond enforcement, or comparable Category-3 process.

*Malhan* addresses the family-court version of that problem: ordinary family-court payment orders are the output of judicial functions, not orders that ensure courts can perform those functions, and therefore do not satisfy Category 3.[47]

*TitleMax* confirms that *Middlesex* is not a freestanding test and that generalized federalism concerns cannot expand *Younger* beyond *Sprint*'s gateway categories.[48]

The source-of-injury analysis confirms why Category 3 cannot be stretched here. Yan seeks relief for distinct injuries caused by distinct defendants: fabricated support labeling and altered-order conduct by the Attorney Defendants; temporary QDRO-type conduct by DeAngelis; grievance-related shielding by SBTX Defendants; and distribution by U.S. Bank

---

[45] *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78, 81–82 (2013); *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 508–09 (5th Cir. 2021).

[46] *Daves v. Dallas Cnty.*, 64 F.4th 616, 625–30 (5th Cir. 2023) (en banc).

[47] *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 462–63 (3d Cir. 2019).

[48] *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 237 (3d Cir. 2022); see also *Covington v. Humphries*, No. 24-1158, 2025 WL 1448661, at *5–6 & n.10 (10th Cir. May 19, 2025) (unpublished); *Bellinsky*, 2025 WL 2047809, at *3–4.

despite written notice of conflicting orders. Those injuries arise from defendants' own conduct, not from mere dissatisfaction with a state judgment.[49]

The same source-of-injury premise that avoids Rooker-Feldman also defeats *Younger* Category 3. A court cannot treat the injury as conduct-based rather than judgment-based, yet still invoke *Younger* as if the challenged injury arose from protected judicial-enforcement machinery.

Texas law further undercuts the same-proceeding premise. Section 30.017 requires covered judge-directed claims added to a pending case to be severed, assigned a new cause number, and assigned to a different judge; *Roach* and *Creekside* confirm that severance occurs by operation of law.[50] These authorities do not decide *Younger* by themselves. They show why the district court could not assume that judge-directed federal claims automatically belonged in the same domestic-relations proceeding without first identifying a valid *Sprint* category.

An altered family-court order allegedly relabeled to extract ERISA funds for private legal fees—including fees allegedly tied to a criminal matter—does not fit any *Sprint* category; ERISA's anti-alienation rule controls.

### 2. Even if Younger applied, the with-prejudice merits dismissal was independently wrong.

*Younger* is a deferral doctrine, not a merits doctrine. It does not decide whether the federal claims are valid; it only determines whether a federal court should defer while a qualifying state proceeding runs its course. A with-prejudice dismissal is therefore incompatible with abstention because it extinguishes claims rather than postponing federal adjudication. The district court did the opposite: it dismissed with prejudice the RICO damages, antitrust treble-damages, ERISA-relief, and § 1983 claims. The error is clearest as to damages: even when *Younger* applies, federal damages claims that cannot be redressed in the state proceeding must be stayed, or

---

[49] ROA.1077-1086; ROA.1136; ROA.1139-1142; ROA.2034-2035; ROA.2078-2095.

[50] Tex. Civ. Prac. & Rem. Code § 30.017; *Roach v. Ingram*, 557 S.W.3d 203, 214 n.15 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Creekside Rural Invs., Inc. v. Hicks*, 644 S.W.3d 896, 900 (Tex. App.—Eastland 2022, no pet.).

jurisdiction must be retained; they may not be dismissed.[51] *Quackenbush* likewise confirms that abstention does not justify a with-prejudice merits disposition of legal damages claims.[52] If any injunctive or declaratory relief required deferral, the remedy was claim-specific deferral or dismissal without prejudice after a proper category analysis—not a global merits bar. ROA.2078-2095; ROA.3064-3065.

### 3. ERISA preemption and remedial mismatch independently defeat any adequate-state-forum fallback.

ERISA independently defeats the district court's adequate-state-forum assumption. This Court has recognized that ERISA may confer federal jurisdiction separate and apart from the precise articulation of a cause of action, and E-Systems held that federal ERISA preemption warranted federal relief even against a strong state tax-collection interest.[53] If ERISA preemption defeated abstention in the face of state tax-collection interests, a divorce docket could not automatically supply an adequate forum for deciding whether ERISA-protected plan assets were routed through a non-QDRO mechanism to private attorney-fee claimants.[54]

The pleaded facts make the ERISA issue dispositive, not collateral. The complaint identifies an actual 401(k) plan, ERISA's anti-alienation rule, and a direct conflict between ERISA's QDRO requirements and the alleged transfer to private attorney-fee claimants. Barrows's email stated that "In order for us to obtain our attorney's fee, we must say the order is for spousal support…," and that "there is no way around it." ROA.1079. Credited at Rule 12, that allegation means the "spousal support" label was the extraction channel, not an adjudicated support right. ERISA permits a QDRO only when the order recognizes rights of a statutory alternate payee; a label inserted to route attorney-fee debt to private lawyers cannot make those lawyers alternate payees. 29 U.S.C. § 1056(d)(1), (3), (3)(K).

---

[51] *Deakins v. Monaghan*, 484 U.S. 193, 202–03 (1988); *Lewis v. Beddingfield*, 20 F.3d 123, 125 (5th Cir. 1994); *Ballard v. Wilson*, 856 F.2d 1568, 1572 (5th Cir. 1988).
[52] *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 719–31 (1996).
[53] *ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 523 (5th Cir. 2013); *E-Sys.*, 929 F.2d at 1102–04.
[54] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

Chapter 9 reinforces the mismatch. *Morrison* and *Dalton* confirm that Chapter 9 is decree-based and does not supply free-standing authority to create or modify property rights outside its statutory limits. As pleaded, the temporary QDRO-type mechanism was used before the required decree-enforcement posture existed. A state proceeding that did not supply the statutory authority for the challenged ERISA-routing act could not automatically serve as an adequate substitute forum for the federal ERISA, RICO, antitrust, and § 1983 claims pleaded here.

Nor could the state divorce court supply the claims and remedies pleaded here against these defendants in their federal capacities: civil RICO damages and fees under 18 U.S.C. § 1964(c); antitrust treble damages and prospective relief under 15 U.S.C. §§ 15(a), 26; ERISA equitable relief under 29 U.S.C. § 1132(a)(3); and § 1983 relief. At minimum, abstention had to be justified claim by claim, defendant by defendant, and remedy by remedy.[55] The district court skipped *Sprint*'s gateway, treated *Middlesex* as the test, ignored ERISA's preemptive remedial path, and entered a with-prejudice judgment. That *Younger* ruling independently requires vacatur. ROA.2085 n.3, 2078-2095, 3064-3065.

C. The Rule 12 dismissal cannot stand because the district court answered a materially different case by recasting ERISA diversion as a domestic-relations grievance and substituting unbriefed theories for Yan's pleaded § 664 and § 2 claims (Issue 5).

100. Issue 5 is the Rule 12 version of the same error. The district court did not merely reject Yan's theories; it answered different theories. That distinction matters because Rule 12 tests the complaint as pleaded, not a substituted complaint assembled from judicial labels, later paperwork, or defendants' characterizations.

---

[55] *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928–29 (1975).

101. Across the motions to dismiss, defendants largely used the same boilerplate move. They recast this action as a generalized domestic-relations collateral attack and then stacked threshold labels on top of that recasting: no standing, no redressability, Eleventh Amendment immunity, *Ex parte Young* inapplicable, *Younger*, and judicial or qualified immunity. But the complaint was not pleaded as relitigation of a disfavored domestic-relations outcome. It pleaded specific federal claims arising from defendants' own alleged conduct toward an ERISA-protected fund. Reducing that complaint to divorce dissatisfaction is the core Issue 5 error. ROA.2078-2095; ROA.2981-2992.

Table 3: Substituted Theories Decided by the District Court

| Pleaded theory | District court answered | Why that is reversible |
|---|---|---|
| ERISA/non-QDRO diversion of protected 401(k) assets to non-alternate-payee attorney-fee claimants | Domestic-relations dissatisfaction with state divorce rulings | Wrong source of injury; the federal question was whether ERISA permitted the alleged transfer mechanism |
| RICO predicates centered on 18 U.S.C. § 664 conversion of employee-benefit-plan assets | 18 U.S.C. § 1956 money-laundering reasoning | Wrong predicate statute; § 664 protects plan assets even when the surrounding paperwork uses domestic-relations labels |
| § 664 as a RICO predicate under § 1961(1) | § 664 as a standalone civil cause of action dismissed because it is a criminal statute | Category error. RICO predicates are criminal statutes by design; § 1961(1) supplies the predicate and § 1964 supplies the civil remedy. |

| Sherman Act § 2 legal-services consumer-monopoly/predatory-conduct theory | § 1-style market-competition and competitor-injury reasoning | Wrong antitrust framework; Yan pleaded consumer injury from monopolized legal-service machinery, not a competitor dispute |
| --- | --- | --- |

102. The § 664 error is the cleanest example. Doc. 148 stated that Yan "attempts to sue U.S. Bank under 18 U.S.C. §§ 664, 1027, 1341, 1343, and 1349," then held: "Those are criminal statutes and do not create civil causes of action." ROA.2093. That answers a claim Yan did not bring. Yan pleaded civil RICO under § 1962 based on predicate violations of § 664, § 1341, and § 1343, and he sought civil RICO remedies; he did not plead § 664 as a freestanding private cause of action.[56] The U.S. Bank allegations likewise pleaded those statutes as RICO predicate acts tied to the fund-diversion sequence, not as standalone civil claims. ROA.1129–1133. Section 1964 supplies the civil RICO remedy; a RICO predicate need not create its own private right of action.

103. The complaint says "401(k)." The dismissal says "funds under his control." That is not a paraphrase; it is the substitution. The complaint identified the fund, the amount, the recipients, the statutory ERISA protection, the alleged non-QDRO route, the spousal-support relabeling, the plan administrator's conflict notice, and the post-

---

[56] ROA.31–33; ROA.1053–1055; ROA.1118–1132.

notice distribution.[57] Those are not domestic-relations labels; they are federal elements and record facts. The substitution was not abstract. Table 4 gives record-based examples showing the mismatch in the court's own terms. ROA.1683; ROA.2078–2095.

104. The complaint pleaded not ordinary fee litigation, but a routing channel: defendants allegedly converted ERISA-protected 401(k) assets into attorney-fee payments by attaching the label "spousal support" to what was actually a fee demand, embedding that relabeling in altered QDRO-type instruments, and using the plan administrator to release the funds despite acknowledged conflict in the operative orders. That mechanism is what 18 U.S.C. § 664 reaches—conversion of employee-benefit-plan assets to the use of another.[58]

105. The substitutions were especially untenable because the case was pleaded through documentary allegations, not speculation. The facts that define the case came from participants' own writings and attached instruments. The Spousal-Support-Email, the Would-Not-Be-True Email, and the Have-to-Lie Email, are not legal conclusions. There is no pleading standard under which a party's own written

---

[57] ROA.1065–1081; ROA.1129–1133; ROA.1141; ROA.1143–1145; ROA.2034–2035.
[58] ROA.1077-1081; ROA.1136; ROA.1139-1142.

statements, attached to the complaint, are "conclusory"—they are participant admissions. ROA.1079; ROA.1080.

106. The same mistake controlled RICO. Section 664 reaches conversion; § 1956 reaches laundering. Yan pleaded conversion, but the court analyzed laundering. Once that substitution occurred, the pleaded predicates, enterprise, pattern, and conspiracy analysis could not be performed on the theory Yan actually filed. ROA.2078-2095.

107. The same mistake controlled antitrust. Yan pleaded a § 2 consumer-monopoly injury arising from a state-licensed legal-services structure allegedly used to extract and shield attorney-fee payments. The court dismissed through a § 1-style lens focused on market competition and competitor-type injury. This appeal does not require final proof of a § 2 market. It requires only recognition that a § 2 claim cannot be dismissed by analyzing a materially different § 1 theory. ROA.2078-2095.

108. The same mistake controlled the defendant-specific rulings. Once the case was recast as divorce dissatisfaction, state-actor conduct became ordinary adjudication, attorney conduct became ordinary advocacy, disciplinary shielding became grievance dissatisfaction, and U.S. Bank's conflict-aware distribution became ministerial processing. Those conclusions followed from the substituted premise, not from the complaint as pleaded. ROA.2078-2095; ROA.2981-2992.

109. Every threshold ruling depended on that unmade genuineness finding: judicial immunity assumed ordinary judicial action; attorney immunity assumed ordinary advocacy about genuine court instruments; *Younger* assumed a legitimate state-court enforcement interest; and U.S. Bank's "single, discrete and otherwise lawful transaction" theory assumed the later signed paper was a valid operative instrument. The complaint alleged otherwise, and Rule 12 required that allegation to be tested rather than bypassed.[59]

110. Vacatur is therefore required without this Court deciding the merits in the first-instance. The correct frame here is ERISA plan-asset diversion, § 664 predicate acts, a § 2 consumer-monopoly theory, and defendant-specific conduct. The district court did not decide that case. ROA.2078-2095; ROA.2981-2992.

111. The substitution was not abstract. The complaint and record used one operative frame; the Pittman Decisions used another. The record-based examples below show the mismatch in the court's own terms. ROA.1070-1081; ROA.2078-2095.

Table 4: Record-Based Examples of Premise Substitution

| What Yan Actually Alleged | What the Pittman Decisions ROA Substituted |
| --- | --- |
| | |

---

[59] ROA.1077-1081; ROA.2034-2035; ROA.2078-2095.

| | | |
|---|---|---|
| ERISA pension fund / 401(k) | **"certain** funds under his control" | ROA.1683 |
| § 664 **pension fund embezzlement** | § 1956 **"launder money"** | ROA.2089, ROA.2091 |
| Sherman Act § 2 **predatory monopoly** | Sherman Act § 1 **"market competition"** | ROA.2080, ROA.2090 |
| Temporary QDRO without petition | "interim order" within authority | ROA.2082, ROA.2084 |
| RICO § 664 theory | Generic racketeering framing | ROA.2089-2091 |
| **Altered** court order as usurpation | Zealous advocacy in **contentious** divorce | ROA.2087 |
| Associate judge **without** jurisdiction | DeAngelis acting within authority | ROA.2082, ROA.2125 |

D. The court terminated this case prematurely because it imposed an unauthorized amendment restriction, dismissed with prejudice without identifying dispositive deficiencies, denied reconsideration without a governing standard, and denied Rule 15(a)(2) leave on the wrong pleading (Issues 6–9).

112. The amendment issue is chronology-driven. The court counted amendments that were not meaningful merits opportunities, imposed an extra-textual amendment lock before the dispositive defects were identified, then denied the first real post-remand merits amendment by measuring futility against the wrong pleading.[60]

113. Doc. 42 created the first distortion. The court struck separately filed exhibit attachments and expressly instructed that "Plaintiff must seek leave to file an amended complaint at this stage in the proceedings." Yan's Second Amended

---

[60] ROA.560; ROA.2972-2973; ROA.2981; ROA.2990-2992; ROA.3023-3026.

Complaint complied with a filing-mechanics directive by refiling the exhibits in a merged single PDF; it was not a voluntary attempt to cure merits defects later identified in the dismissal orders.[61]

114.   Doc. 58 created the second distortion. When allowing the TAC, the magistrate judge added sua sponte that no future amendment would be allowed absent "extraordinary circumstances." No defendant had yet filed the dispositive motions that later supplied the alleged defects. No Rule 16 scheduling order had displaced Rule 15. And no party had requested or briefed an amendment bar.[62]

115.   The first true post-dismissal merits-cure request came after remand. Yan immediately sought reconsideration and amendment treatment after the Fifth Circuit confirmed the finality defect created by the unadjudicated Pigg claims. The appellate detour was not plaintiff-created delay; Yan had raised the omitted-Pigg problem in Doc. 150, and the Fifth Circuit later agreed that Pigg was "not adjudicated, or even addressed."[63]

116.   Doc. 210 then supplied the PFAC and Wang affidavit. The district court did not test that PFAC. It treated futility as if the superseded TAC remained the measure.

---

[61] ROA.560; ROA.9; ROA.716-717.
[62] ROA.10; ROA.2981; ROA.2990-2992.
[63] ROA.2097-2104; ROA.2186-2188; ROA.2365-2369.

That is legal error because futility asks whether the PFAC would survive Rule 12, not whether the old pleading did. The error matters especially for RICO: Doc. 210-1 did not merely repeat the TAC; it consolidated the ERISA-fund-diversion theory, Wang's first-hand corroboration, the Barrows/Pigg communications, the writ sequence, the U.S. Bank conflict notice, and the historical pattern allegations into the PFAC the court was required to evaluate. ROA.2981-2992; ROA.3023-3026.

117.   The Wang Affidavit Defeats Futility. The Wang affidavit required a separate futility analysis because it supplied newly available, first-hand corroboration from the opposing party in the state case. It corroborated that the April 13 proceeding was an attorney-fee hearing, not a pleaded and heard support proceeding; it confirmed the fee-payment economic reality of the transaction; and it was executed on October 18, 2025, after the earlier dismissal path and immediately before the mandate returned. The district court could not deny leave by testing the superseded TAC while ignoring the affidavit and PFAC that Rule 15 required it to evaluate. ROA.2538-2540; ROA.2981-2992.

118.   The affidavit also had to be considered because it answered the anticipated alternate-payee defense at the pleading stage. Defendants may argue that Wang received funds as an alternate payee and later paid Barrows on her own. But the PFAC alleged a different transaction: the order and communications directed a fee-

payment mechanism through a support label, the payment was economically for attorney's fees rather than support, and the label was inserted after the fee hearing to reach ERISA-protected assets that attorney-fee claimants could not receive as alternate payees. At Rule 15 futility, that pleaded procurement theory had to be accepted unless contradicted by the record. The district court instead treated the label as conclusive and the affidavit as immaterial.[64]

119. The "best-case" rationale therefore cannot stand. A court may deny further amendment only after a plaintiff has been apprised of the complaint's specific insufficiencies and given a fair opportunity to cure them. *Bazrowx v. Scott*[65] defines the "best-case" point that way: the plaintiff must first be "apprised of the insufficiency" and then fail to cure. That did not happen here.

120. Yan preserved the amendment-history point below: the First Amended Complaint corrected a caption misnomer; the Second Amended Complaint consolidated separately filed exhibits only because the court directed that attachments had to be filed with the complaint; and the TAC added U.S. Bank without materially changing the existing fraud allegations. ROA.3023–3024. Those were not repeated failed merits amendments.

---

[64] ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.2538-2540.
[65] *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998).

121. Nor did Doc. 58 displace Rule 15(a)(2): the "extraordinary circumstances" restriction was sua sponte, not requested by any party, not a Rule 16 scheduling deadline, and entered before Yan obtained the August 2024 docket-transaction history, before remand, and before Wang's October 18, 2025 affidavit. The actual post-remand amendment request was timely because the case remained on appeal until October 20, 2025, and Yan filed Doc. 210 after remand and after obtaining Wang's affidavit. The denial therefore rested on the wrong premise: technical and court-compelled amendments were counted as failed opportunities to cure later-identified merits defects. ROA.3024-3025; ROA.3025-3026.

122. That chronology also answers Doc. 214's August 2024/December 2025 delay rationale. The case was on appeal until the Fifth Circuit mandate returned on October 20, 2025; Yan sought Rule 54(b) reconsideration and amendment/supplement treatment that same day in Doc. 181; Wang's affidavit had been executed on October 18, 2025; and Doc. 210 was the later formal leave to file the PFAC after Doc. 181 had been denied without explanation. Delay cannot be measured as if the district court retained ordinary merits-control jurisdiction during the appeal, as if Yan possessed the Wang affidavit before it existed, or as if Yan first sought amendment treatment on December 30, 2025. The PFAC itself supplied the explanation the FCR ignored: post-remand amendment was the first practical opportunity to add the new corroborating evidence and cure the defects identified through the remand posture.

The court could not deny Doc. 181's embedded amendment request without explanation and then use the later Doc. 210 filing date as the reason to deny formal leave.[66]

123. The cure question cannot be reviewed against an unidentified or shifting defect. On RICO, Doc. 148 avoided § 664 element analysis by treating § 664 as a statute for which "[t]hose are criminal statutes and do not create civil causes of action," even though Yan pleaded § 664 as a RICO predicate. ROA.2093. On antitrust, the order grouped "racketeering or antitrust causes of action" and "RICO/antitrust claims" under generalized Rule 8 and *Iqbal* language after recasting Yan's § 2 consumer-injury theory as market competition. ROA.2092-2093. Those rulings never identified what facts were missing under the pleaded § 664 predicate or § 2 theory. *Great Plains* and *Steury* make leave especially appropriate after Rule 12 where defects are not clearly incurable; here the court treated technical amendments as failed merits opportunities and then denied leave without a proper amendment target.[67]

124. At minimum, the court should have considered targeted leave rather than dismissal with prejudice. Yan expressly requested that fallback relief below.

---

[66] ROA.2183-2188; ROA.2365-2369; ROA.2372-2396; ROA.2538-2540; ROA.2981-2992; ROA.3025-3026.
[67] ROA.2365-2369; ROA.2981-2992; ROA.3023-3057.

ROA.3053. That request matters because Rule 15 asks whether justice requires amendment, not whether a pro se pleading can be ended by counting caption correction, exhibit refiling, and party joinder as failed merits amendments. *Riascos* and *Ogbebor* reinforce the same point: when a pro se litigant's objections or related filings add facts or refine the theory, the court should consider whether those filings operate as a request to amend before entering with-prejudice dismissal.[68] Yan's responses, objections, Doc. 181 request, Doc. 210 PFAC, and Wang affidavit supplied the kind of pro se clarification Rule 15 required the court to evaluate.

II. <u>The defendant-specific dismissals repeat the same premise substitution and add defendant-specific legal errors.</u>

125. Section II shows that the dismissals also fail defendant by defendant. Even apart from the global errors identified in Section I, each dismissal rested on a distinct legal defect: the antitrust ruling addressed the wrong theory; the DeAngelis ruling used blanket immunity without the required functional analysis; the disciplinary-defendant rulings blurred enforcement conduct into adjudication; the rulings for the Barrows-Ybarra Defendants treated pleaded altered-order conduct as ordinary advocacy; the RICO dismissals applied the wrong § 1962(d) standard; and the U.S.

---

[68] *Riascos v. U.S. Marshals Serv.*, 76 F.3d 93, 94–95 (5th Cir. 1996); *Ogbebor v. Hardy*, No. 24-30403, slip op. at 5–6 (5th Cir. Feb. 24, 2025) (unpublished).

Bank ruling disregarded the pleaded notice-and-distribution sequence. ROA.2078-2095; ROA.2981-2992.

126. Across the defendant-specific dismissals, the same premise-substitution error carried into the antitrust and RICO rulings. For antitrust, Yan pleaded a Sherman Act § 2 consumer-monopoly theory, but the district court applied § 1-style market-competition reasoning. For RICO, Yan pleaded a § 664 ERISA-plan-asset diversion theory, but the district court analyzed § 1956 money laundering instead. Those substitutions affected the defendant-specific rulings addressed below. ROA.2078-2095; ROA.2981-2992.

A. The antitrust dismissal cannot stand because the district court replaced Yan's pleaded Sherman Act § 2 consumer-monopoly claim with an unbriefed § 1-type market-competition theory and, as to SBTX, entered a sua sponte Rule 12(b)(6) dismissal after rejecting SBTX's Rule 12(b)(1) immunity challenge (Issue 10).

127. The antitrust appeal is a wrong-framework issue, not a request for this Court to decide the ultimate market proof. Yan pleaded a Sherman Act § 2 consumer-monopoly theory: a state-licensed legal-services structure allegedly used court power and disciplinary shielding to extract fees from legal-services consumers and protect that extraction channel. ROA.1070-1087; ROA.1090-1092.

128. The district court did not analyze the elements of that theory. It applied § 1-style market-competition reasoning and treated the injury as if Yan were asserting a

competitor dispute. That reframing changed both the legal standard and the injury. Those authorities[69] confirm that consumers may suffer antitrust injury; the court's competitor-market framing therefore did not answer the claim pleaded. ROA.2078–2095.

129.   The error is especially clear as to SBTX. SBTX's opening motion included general Rule 12(b)(6) language, but it did not present a claim-specific Rule 12(b)(6) attack on Yan's pleaded Sherman Act § 2 theory. The FCR recommended dismissal on Rule 12(b)(1) grounds. Pittman acknowledged that, "[o]rdinarily, Yan's claim would survive dismissal under Rule 12(b)(1)," then described that survival as a "Pyrrhic victory" because the court would dismiss RICO and antitrust under Rule 12(b)(6). ROA.2090. The court supplied that merits dismissal without adversarial, claim-specific briefing on the pleaded § 2 framework.[70]

130.   The procedural defect is rule-based, not technical. Rule 8(b)(1)(A) requires a responding party to state its defenses "to each claim asserted," Rule 12(b) governs defenses "to a claim for relief," and Rule 7(b)(1)(B) requires a motion to state the grounds for relief "with particularity." Fed. R. Civ. P. 7(b)(1)(B), 8(b)(1)(A), 12(b). General Rule 12(b)(6) boilerplate could not substitute for adversarial briefing on

---

[69] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472–84 (1982); *Apple Inc. v. Pepper*, 587 U.S. 273, 279–80 (2019).
[70] ROA.1682-1699; ROA.2078-2095; ROA.2090-2093.

market definition, monopoly power, exclusionary conduct, consumer antitrust injury, causation, or other § 2-specific pleading defects. After rejecting SBTX's Rule 12(b)(1) immunity bar to the RICO and antitrust claims, the district court could not enter a with-prejudice merits dismissal of the § 2 claim on a ground SBTX did not specifically present.[71]

131. Doc. 148 contained no standalone Sherman Act § 2 analysis. It recast the alleged scheme as one to "protect against market competition," called Yan's monopoly allegations a legal-market "policy grievance," and dismissed the combined "RICO/antitrust claims" under generalized *Iqbal* language. ROA.2091-2093. It did not analyze market definition, monopoly power, exclusionary conduct, consumer or antitrust injury, causation, or § 2 versus § 1. Without a claim-specific § 2 defect, futility and "best-case" could not follow.

132. The remedy is vacatur, not appellate market construction. The district court should decide in the first-instance whether the pleaded § 2 theory, as clarified by the PFAC and supporting materials, states a plausible consumer-monopoly claim. What it could not do was dismiss a § 2 theory by answering a § 1 case.

---

[71] *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 310–11 (5th Cir. 2014); *United States v. Sineneng-Smith*, 590 U.S. 371, 375–77 (2020).

B. The DeAngelis dismissal cannot stand because the district court applied judicial-immunity and no-adversity doctrines in bulk to conduct alleged to fall outside Chapter 9 authority, outside ERISA's QDRO exception, and outside ordinary domestic-relations adjudication because criminal-case fee debt was allegedly routed through a fabricated "spousal support" label, without the function-by-function analysis federal law requires (Issue 11 and sub-issues 11(a)–11(d)).

133.   The DeAngelis ruling should be vacated because the court did not perform the function-specific immunity analysis required by federal law, relied on *McKinley* for a judicial-immunity proposition *McKinley* does not contain, and used Texas Family Code § 201.017 to borrow district-judge immunity while ignoring the state-law limits that make ruling-only categorical immunity untenable. ROA.2081-2082; ROA.2084-2085.

134.   First, the complaint alleged an authority defect, not merely legal error within ordinary adjudication. Yan alleged no QDRO petition, no support pleading, no support hearing, no Chapter 9 decree-enforcement posture, a temporary pre-decree QDRO-type order, and a fabricated support label used to reach ERISA-protected retirement assets. Those allegations required the court to ask what function DeAngelis allegedly performed and whether that function was within the court's lawful authority.[72]

---

[72] ROA.1065-1070; ROA.1077-1081; ROA.1141.

135. Nor was April 13 the first alleged instance of DeAngelis directing fee payments without ordinary adversarial predicates. The November-2021-Order allegedly shows DeAngelis ordering Yan to withdraw $10,000 from his bank accounts without any motion, pleading, evidence, or testimony on attorney fees— five months before the April 13 order targeted the 401(k). The April 13 QDRO was therefore the second, not the first, pleaded instance of the same fee-payment mechanism. The challenge goes to the legality of the mechanism itself. ROA.1073-1074; ROA.2702.

136. *Forrester and Stump*[73] *require that act-specific inquiry. The robe does not convert every act into protected judicial action when the complaint alleges conduct outside the lawful channel invoked. Morrison and Dalton supply the Texas Chapter 9 boundary: enforcement jurisdiction exists, but Chapter 9 cannot be used to modify a decree or supply authority that the statute withholds. ERISA supplies the federal consequence: even a valid state domestic-relations order must satisfy § 1056(d)(3) before plan assets may be alienated.*[74]

---

[73] *Forrester v. White*, 484 U.S. 219, 227–29 (1988); *Stump v. Sparkman*, 435 U.S. 349, 362–64 (1978).
[74] ROA.1065–1070; ROA.1077–1081; ROA.1141.

137. Second, the court's *McKinley* citation is a self-contained reversible defect. The order cited *McKinley v. Abbott*[75] as if it supported blanket judicial immunity. It does not. *McKinley* involved the Eleventh Amendment bar to state-law claims against the Texas Attorney General; page 406 did not analyze judicial immunity, associate-judge authority, Chapter 9, QDROs, or ERISA. A dismissal with prejudice cannot rest on a case used for a proposition it does not contain. That verifiable factual error cannot support affirmance. ROA.2082.

138. *Bauer's no-adversity rule also does not solve the problem. Yan did not sue DeAngelis merely because she neutrally adjudicated the constitutionality of a statute. He challenged the alleged use of a pre-decree QDRO-type mechanism to route ERISA-protected plan assets to private attorneys through a fabricated support label. That is a defendant-specific conduct theory, not a generalized request to make a judge defend the statute she applied.*[76]

139. *Bauer therefore does not create a title-based safe harbor for judges. It applies only when the challenged conduct is the neutral application of existing law under the statute that supplied the judge's authority. That premise was never established here. The district court identified no Texas-law source authorizing the specific*

---

[75] *McKinley*, 643 F.3d at 406.
[76] ROA.1065-1070; ROA.1077-1081; ROA.1141.

*challenged act: use of temporary, pre-decree, QDRO-type machinery to reach*

*ERISA-protected retirement funds without a Chapter 9 petition, without notice by*

*citation, and without any decree-based property division to implement or clarify.*

*Chapter 9 is a post-decree framework; § 9.102 requires a petition and citation*

*procedure; and Chapter 201 grants only limited, delegated powers to an associate*

*judge, not free-standing authority to devise a temporary QDRO mechanism outside*

*that framework. Bauer tied no-adversity to a statute and its procedural safeguards;*

*here, the court identified no statute authorizing the specific pre-decree act.*[77]

140.  *Holloway* does not cure that omission. The order cited *Holloway v. Walker*[78] for the conspiracy-and-immunity point, but *Holloway* is downstream of the required function-by-function inquiry the district court never performed. *Holloway* also recognizes that judicial immunity does not extend to equitable and declaratory relief under § 1983, and Yan sought equitable restoration and prospective relief. Unlike *Holloway*, where Texas law authorized the challenged act, Yan alleges that no Texas law authorized the temporary QDRO-type order outside Chapter 9's post-decree framework. ROA.2084 n.2; ROA.1065-1070; ROA.1141.

---

[77] ROA.1065-1070; ROA.1141; ROA.2081-2084.
[78] *Holloway v. Walker*, 765 F.2d 517, 522, 525 (5th Cir. 1985).

141.   Nor can Texas Family Code § 201.017 enlarge federal immunity or defeat federal ERISA, RICO, or § 1983 claims. Section 201.017 gives an associate judge the judicial immunity of a district judge; it does not give broader immunity than a district judge would have. District-judge immunity under *Forrester* still requires function-by-function analysis. Section 201.017 therefore incorporates the *Forrester* limitation rather than replacing it with title-based immunity, and it cannot convert an alleged lack of authority into a categorical federal-immunity bar. ROA.2084-2085.

142.   That is the missing Texas-law step. The district court relied on Texas Family Code § 201.017 because an associate judge "has the judicial immunity of a district judge." ROA.2084-2085. That provision does not give an associate judge greater immunity than a district judge. If § 201.017 supplies the immunity benchmark, then the district court had to examine the state-law limits on that benchmark before treating DeAngelis as categorically immune.

143.   Texas Civil Practice and Remedies Code § 30.017 defeats the district court's categorical state-law immunity premise. Texas district judges are not absolutely and categorically immune from every suit merely because the challenged conduct occurred in a case. Section 30.017 expressly recognizes that a claim against a district-court judge may exist, but draws a pleading line: the claim must be sworn, may not be based solely on rulings in the pending case, and must plead specific facts

supporting each element of the claim in addition to the rulings. Tex. Civ. Prac. & Rem. Code § 30.017(a)(1)-(3). The statute then automatically severs the judge claim and assigns it a new cause number for resolution by a different judge. *Id.* § 30.017(b)-(c). That structure defeats the premise that a Texas judge is judicially immune under state law from every suit connected to a pending case. Texas law bars ruling-only attacks; it does not impose title-based immunity for separately pleaded claims supported by facts beyond the adjudicative result.

144. That point applies directly because the district court relied on Texas Family Code § 201.017, which gives an associate judge "the judicial immunity of a district judge." ROA.2084-2085. Section 201.017 does not give an associate judge more immunity than a district judge. If district-judge immunity is the benchmark, then § 30.017 defines the state-law limit on the district court's premise: Texas does not treat district judges as immune from all suits. It permits judge-directed claims when the plaintiff pleads specific facts beyond disagreement with rulings. Yan pleaded those facts: a pre-decree, temporary QDRO-type mechanism; no QDRO petition; no support pleading or support hearing; altered support-label paperwork; and use of court machinery to move ERISA-protected plan assets to non-alternate-payee attorneys.[79] The district court therefore erred by granting categorical immunity

---

[79] ROA.1065-1070; ROA.1077-1081; ROA.1141.

without first examining Texas law, the source of DeAngelis's authority, and whether the challenged conduct was within the protected judicial function.

145. This argument does not ask Texas law to abolish federal judicial-immunity doctrine. It exposes the flaw in the district court's own state-law premise. Federal immunity still requires a functional analysis of the act performed and whether the act was taken within jurisdiction.[80] The district court skipped that analysis.

146. The proper remedy is remand for the district court to decide the actual question: whether the alleged pre-decree, non-QDRO, support-label transfer of ERISA-protected plan assets was a judicial function within jurisdiction or an act outside the authority pleaded. The district court never answered that question. ROA.2078-2095.

C. The SBTX and disciplinary-defendant dismissals cannot stand because Yan was not a disciplinary respondent, did not seek review of any disciplinary judgment, and pleaded later bar conduct as post-notice shielding of an ERISA-fund diversion—not grievance dissatisfaction (Issue 12 and sub-issues 12(a)–12(c)).

147. The SBTX and disciplinary-defendant issue is a wrong-injury issue. Yan was not a disciplinary respondent, did not seek review of a disciplinary judgment, and did not ask the federal court to supervise bar discipline. He pleaded the grievance

---

[80] *Forrester*, 484 U.S. at 227–29; *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991).

sequence as notice, knowledge, enforcement connection, and post-notice shielding of an ERISA-fund diversion. ROA.1083-1086.

148. *Liedtke does not decide this theory. Liedtke, Krempp, and Bishop involved attorneys attacking their own State Bar disciplinary proceedings. Yan was not the respondent, target, or party in any disciplinary case, and he does not seek review of a disciplinary judgment. The grievance record is pleaded as notice, knowledge, enforcement connection, and post-notice shielding of an ERISA/RICO injury. Treating that theory as a barred grievance appeal repeats the district court's premise substitution. The categorical immunity in those cases does not reach disciplinary actors' alleged post-notice shielding of a third-party ERISA-fund diversion from corrective process. ROA.1083-1086; ROA.2088.*

149. Once the injury is stated correctly, the dismissal frame falls away. The complaint alleged that after written notice and after BODA rejected facial dismissal, disciplinary actors preserved the consequences of the alleged ERISA extraction rather than allowing corrective process. That theory may succeed or fail under federal RICO, antitrust, § 1983, and *Ex parte Young* standards, but it is not a grievance appeal.[81]

---

[81] ROA.1083-1086; ROA.1084; ROA.1095; ROA.1097.

150. State-law immunity provisions do not answer federal claims. Those authorities[82] prevent state labels, state procedural rules, or state immunity clauses from functionally immunizing defendants from federal rights. The district court therefore had to analyze federal cause of action by federal cause of action, and official by official for prospective relief.

151. *Younger likewise does not bar these claims. The alleged injury flows from the defendants' own post-notice shielding and enforcement connection, not from a pending disciplinary prosecution against Yan. No Sprint category was identified, and no disciplinary judgment against Yan was being reviewed. ROA.1083-1086; ROA.2085 n.3.*

152. The remedy is vacatur for claim-specific analysis. The court should decide whether the pleaded post-notice shielding theory states federal claims and whether prospective relief can run against particular officials under *Ex parte Young*.[83] It should not dismiss by relabeling the case as grievance dissatisfaction.

---

[82] *Howlett v. Rose*, 496 U.S. 356, 376–83 (1990); *Haywood v. Drown*, 556 U.S. 729, 739–41 (2009); *Williams*, 604 U.S. at 174; *Doe*, No. 25-180, slip op. at 1; *Taylor v. Tolbert*, 644 S.W.3d 637, 653–56 & n.103 (Tex. 2022).
[83] *Ex parte Young*, 209 U.S. 123 (1908).

D. The Barrows-Ybarra and Pigg dismissals cannot stand because the complaint pleaded altered-order and coordinated diversion conduct beyond ordinary advocacy, and Pigg's post-remand dismissal reused prior reasoning without Pigg-specific merits review (Issues 13–14 and sub-issues 13(a)–13(c)).

153. The arguments as to the Attorney Defendants should be kept separate because the errors are different. For the Barrows-Ybarra Defendants, the question is whether attorney immunity can cover the alleged conduct. For Pigg, the question is whether the post-remand Rule 12(c) dismissal supplied the defendant-specific review the Fifth Circuit remand required. ROA.1682-1699; ROA.2981-2992.

154. As to the Barrows-Ybarra Defendants, the complaint pleaded more than ordinary advocacy. It alleged false fee proof, criminal-case charges presented as family-case fees, altered proposed-order language, and a first-time "spousal support" label used to reach ERISA-protected retirement assets for private attorney-fee recipients. Those allegations required claim-by-claim analysis, not categorical attorney immunity.[84]

155. *Youngkin does not change that result. Youngkin protects the kind of conduct an attorney performs when representing a client in litigation; it does not transform*

---

[84] ROA.1070; ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.1157-1178.

*alleged false-fee proof, document alteration, or relabeling of fund categories to reach ERISA-protected assets into ordinary advocacy.*[85]

156. Texas attorney immunity does not provide a categorical threshold defense to federal statutory civil causes of action, including RICO, antitrust, and § 1983 claims. The district court described Texas attorney immunity as "wide-ranging and robust," ROA.2087, but that breadth did not answer the federal source-of-law question. *Taylor* held that Texas attorney immunity does not automatically apply to a federal statutory claim merely because Texas common law would recognize it; the inquiry depends on the governing statute.[86] Yan preserved and renewed that point below: his objections quoted *Taylor* and objected that the FCR automatically applied attorney immunity without analyzing the particular federal statute, and his supplemental objections responded that *Taylor* was not limited to the federal wiretap statute. ROA.1793–1795; ROA.1824–1825.

157. Pittman addressed attorney immunity, but he cited no authority distinguishing § 1983 from RICO or antitrust for state-law immunity purposes. The order recognized Yan's argument that attorney immunity does not apply to "claims brought pursuant to a federal statute like RICO," then proceeded "[w]ithout reaching a

---

[85] *Youngkin v. Hines*, 546 S.W.3d 675, 681 (Tex. 2018); ROA.1077-1081; ROA.1136; ROA.1139-1142; ROA.1157-1178; ROA.2087.
[86] *Taylor*, 644 S.W.3d at 653–56 & n.103.

conclusive determination" on the immunity/source-of-law question to dismiss RICO and antitrust under Rule 12(b)(6). ROA.2090–2091. That split left the § 1983 claim in the state-immunity lane even though § 1983, RICO, and antitrust are federal statutory civil causes of action governed by federal law. If the Barrows-Ybarra § 1983 claim failed, it had to fail under federal § 1983 standards—state action, causation, and deprivation of a federal right—not under Texas common-law immunity. *Howlett*, *Haywood*, and *Williams* confirm that state-law labels, immunity rules, exhaustion requirements, and procedural devices cannot functionally immunize defendants from federal causes of action. The district court therefore could not treat Texas attorney immunity as a categorical bar to the Barrows-Ybarra federal statutory claims; those claims had to be tested under federal law and federal pleading standards.

158. As to Pigg, the reversible error is cleaner. The prior appeal was dismissed for lack of jurisdiction because Pigg had not been adjudicated. On remand, the court had to evaluate Pigg's own pleadings posture under Rule 12(c), including his answer and the complaint's Pigg-specific allegations. Instead, the post-remand FCR imported the prior reasoning directed at other defendants and added limited Pigg-specific comments. That did not cure the problem the Fifth Circuit identified. ROA.2186-2188; ROA.2981-2992.

159. The district court cured the finality defect formally but repeated the analytical defect substantively. This Court identified the absence of adjudication: Pigg's liability was "not adjudicated, or even addressed." ROA.2187. On remand, the FCR supplied a formal ruling, but not a Pigg-specific adjudication of the distinct RICO, antitrust, and § 1983 claims pleaded against him. Importing prior reasoning entered against other defendants did not answer Pigg's different posture as an answering defendant, his alleged role in the order sequence, or the pleadings as a whole under Rule 12(c). The defect this Court identified therefore remained in substance: a ruling label replaced the adjudication the remand required. ROA.2187-2188; ROA.2981-2992.

160. That single sentence of incorporation constituted the FCR's entire RICO analysis for Pigg. The FCR identified no predicate acts attributed to Pigg, named no predicate statute, and performed no pattern analysis—no relatedness inquiry, no continuity inquiry. It did not apply *Salinas*'s § 1962(d) conspiracy standard, did not engage the enterprise standard, and did not address the § 664 predicate Yan actually pleaded against Pigg. ROA.2981-2992.

161. Doc. 214's antitrust analysis as to Pigg imports the same wrong-framework error from Doc. 148 and adds a facial category mistake. Yan and Pigg were not competitors, and Yan did not plead a competitor-injury case. Yan pleaded a Sherman

Act § 2 legal-services consumer-monopoly theory: state-licensed legal-services actors allegedly used court process, self-regulatory shielding, and ERISA-bypass paperwork to extract consumer property. Doc. 214 therefore could not dismiss the Pigg antitrust claim by asking whether Yan pleaded competitor-style market facts or the mechanics of a § 1-type agreement. The proper question was whether Pigg's alleged participation in the ERISA-fee extraction mechanism plausibly connected him to the pleaded § 2 consumer-injury theory. A Rule 12(c) dismissal cannot be affirmed by saying "no facts" while bypassing the legal theory actually pleaded. ROA.2981-2992.

162. The § 1983 analysis against Pigg likewise applied a private-actor/no-meeting-of-minds rule without engaging the complaint's Pigg-specific documentary chain. TAC paragraph 70 alleged that on April 13, 2022, DeAngelis ordered Yan to pay Pigg $25,000 from his 401(k) even though Pigg had filed no fee petition, offered no fee testimony, and presented no fee evidence. The complaint characterized that award as an incentive: DeAngelis allegedly offered Pigg "$25,000 in exchange for his cooperation" in not appealing the unlawful order. ROA.1070. TAC paragraph 93 then alleged that Pigg "consented to this unlawful proposed order," and that the associate-judge report ordered Yan to pay Pigg and Barrows $25,000 each from Yan's out-of-state 401(k); that report was attached as Exhibit 7. ROA.1076; ROA.1141. A pleaded exchange of consideration between a private attorney and a

state judicial officer, on a specific date, for a specific act, corroborated by a signed order, satisfies the governing joint-action standard[87] without any further detail about "when, where, or how" the agreement was formed. The complaint also alleged that the August 5 email establishing the extraction mechanism named Pigg as a recipient, and that the altered proposed order supplied the instrument under which the payment was routed. ROA.1079; ROA.1141; ROA.1143–1145. Those allegations mattered under the joint-action inquiry because a private actor may act under color of law when he is a willful participant in joint action with the State or acts in concert with state actors.[88] At the pleading stage, the issue is plausibility from coordinated conduct and documents; the complaint's alleged $25,000 consideration exchange, signed order, altered-order sequence, and payment-routing communications were the facts Doc. 214 had to confront. ROA.2981–2992.

163. Doc. 214 also converted a disjunctive joint-action standard into a cumulative checklist. Binding law permits state-action pleading through conspiracy with state actors or willful participation in joint activity with the State.[89] Doc. 214 instead demanded a pleaded agreement date, time, circumstances of formation, and meeting

---

[87] *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941–42 (1982).
[88] *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549–50 (5th Cir. 2005); *Mylett v. Jeane*, 879 F.2d 1272, 1275 (5th Cir. 1989).
[89] *Cornish*, 402 F.3d at 549–50; *Mylett*, 879 F.2d at 1275.

of minds, as if *Twombly* required a signed conspiracy schedule. That was legal error. A court cannot quote "agreement or meeting of the minds" and then apply "agreement and meeting of the minds and formation details." The Rule 12(c) question was whether the pleaded facts plausibly showed Pigg's willful participation in state-assisted deprivation, not whether Yan pleaded the transcript of a conspiratorial agreement's formation. ROA.2981–2992.

164. Rule 12(c) review also differs from Rule 12(b)(6) review because the pleadings were closed and the answer was part of the record. The court therefore had to evaluate the pleadings as a whole, not simply extend earlier Rule 12(b)(6) reasoning to a defendant who had answered and was the reason finality was absent. ROA.2186-2188; ROA.2981-2992.

165. A dismissal that performs none of that analysis is not a Rule 12(c) ruling in substance; it is a summary denial dressed in the form of one.

166. Vacatur is required so the district court can decide the Barrows-Ybarra immunity issue on the pleaded conduct and the Pigg dismissal on Pigg's own pleadings, not on borrowed reasoning. ROA.1682-1699; ROA.2981-2992.

E. The RICO dismissals and RICO futility ruling cannot stand because the district court treated Yan's § 664 predicate as a standalone criminal claim, replaced Yan's ERISA-pension-fund-diversion predicate theory with an unbriefed § 1956 money-laundering framework, applied the wrong § 1962(d) standard, and then denied leave without testing the materially more specific RICO allegations in Doc. 210-1. (Issue 15 and sub-issues 15(a)-15(c)).

167.   The RICO error is narrower than the length of the prior discussion suggested. Yan does not ask this Court to decide the entire RICO case in the first-instance. He asks the Court to vacate because the district court treated the pleaded § 664 predicate as if it needed its own civil cause of action, analyzed the wrong predicate statute, and applied the wrong conspiracy standard. The same error infected Rule 15 futility: once Doc. 210-1 pleaded the alleged enterprise, agreement, predicate communications, injury path, and continuity allegations with greater specificity, the court could not deny leave by recycling analysis directed at the superseded TAC. ROA.2078-2095.

168.   Before reaching pattern, enterprise, conspiracy, prejudice, or futility, the court committed a threshold category error. Doc. 148 stated that Yan "attempts to sue U.S. Bank under 18 U.S.C. §§ 664, 1027, 1341, 1343, and 1349," then held: "Those are criminal statutes and do not create civil causes of action." ROA.2093. But Yan pleaded § 664 as a RICO predicate under § 1961(1), not as an independent private cause of action; § 1964 supplies the civil RICO remedy. That error let the court avoid § 664 element analysis and left no identified § 664 defect to amend.

169. Before analyzing the RICO elements individually, the Court should understand why the district court's predicate-act and pattern conclusions were analytically predetermined rather than merits-based. Counting predicate acts requires first identifying them. Identifying the § 664 predicate required recognizing the fund as an ERISA-protected employee benefit plan, but the Pittman Decisions recast the 401(k) as "certain funds under his control." Identifying mail- and wire-fraud predicates required treating the altered instruments and communications as alleged fraudulent devices, but the order treated the same conduct as ordinary state-court advocacy or court-order implementation. Identifying the § 664 diversion also required recognizing that the money allegedly went to attorney-fee claimants under a fabricated support label, but the order treated the distribution as the product of a legitimate support order. On that premise, the predicate acts were made analytically invisible before Rule 12 analysis began.[90]

170. Nor were the specific pages Pittman decisions cited "fanciful" in the Rule 12 sense. The cited portions of ECF No. 60 at 40-43 identify a concrete real-estate transaction, specific U.S. Bank communications, and the same fund-diversion sequence tied to the attached instruments. ROA.1070-1081. A participant's written statement that the order "must say the fees are for spousal support" because "[t]here

---

[90] ROA.1682; ROA.2078-2095; ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

is no way around it," ROA.1079, is not a conclusory allegation; it is an attached participant admission. The court could reject that theory after analysis, but it could not erase it by labeling the attached communications "fanciful" without identifying the missing RICO element. ROA.2092.

171. First, the pleaded predicate was § 664. The complaint alleged an identified ERISA plan, an identified $25,000 diversion, attorney-fee recipients who were not lawful alternate payees, false fee proof, fabricated support labeling, altered QDRO-type instruments, and distribution despite conflict notice. Those allegations targeted conversion of employee-benefit-plan assets. That is § 664 territory.[91]

172. The court instead answered a § 1956 laundering case. That substitution made the pleaded predicate acts analytically invisible. Whether the same facts would or would not satisfy money-laundering elements does not decide whether they plausibly alleged theft or embezzlement from an employee benefit plan. ROA.2078-2095.

173. Doc. 148's own words confirm the § 1956 substitution. It recast the theory as a "larger conspiratorial scheme to launder money" and an alleged effort "to launder money via various court orders." ROA.2091-2093. But Yan pleaded § 664 ERISA-

---

[91] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

plan theft or embezzlement. The order never analyzed whether the pleaded five-instrument chain plausibly alleged that predicate.[92]

174. Second, the § 1962(d) standard was wrong. *Salinas* and *Elliott*[93] do not require each conspirator personally to commit two predicate acts or independently plead a complete pattern. The relevant question is whether the defendant agreed to further an enterprise's unlawful objective and whether some member would commit predicate acts. The district court's defendant-by-defendant pattern requirement therefore imposed an element RICO conspiracy does not contain. ROA.2078–2095.

175. Third, the five-instrument chain was enough to require analysis under the correct frame. The complaint and exhibits identified the fee affidavit, the alleged relabeling email, the April 13 and May 26 orders, U.S. Bank's conflict acknowledgment, and the distribution. That documentary chain was not a bare conclusion. It was the alleged mechanism by which plan assets moved from ERISA protection to attorney-fee claimants.[94]

176. Doc. 210-1 made that chain stronger, not weaker. It formally tied the alleged Barrows/Pigg communications, Wang's corroboration, the spousal-support

---

[92] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.
[93] *Salinas v. United States*, 522 U.S. 52, 63–66 (1997); *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir. 1978).
[94] ROA.1070-1081; ROA.1136; ROA.1139-1142; ROA.2034-2035.

relabeling, the writ sequence, the U.S. Bank conflict notice, and the historical Texas family-court examples to the RICO elements appellees attacked: enterprise purpose, agreement, predicate acts, causation, injury, relatedness, and continuity. Whether those allegations ultimately prove a RICO violation is not the Rule 15 question. The question was whether amendment was plainly futile. On this record, it was not.

177. Enterprise, pattern, and continuity are downstream from the § 664 threshold error. The complaint alleged an operational extraction cell and an institutional shielding tier, and it alleged a statewide pattern using the same ERISA-bypass mechanism. The PFAC then sharpened those allegations by consolidating the historical examples into formal continuity allegations and adding Wang's first-hand corroboration of the fee-relabeling mechanism. The district court may test those allegations on remand, but it must do so under § 664, *Salinas*, and *Elliott*—not under substituted § 1956 reasoning, a personal-predicate requirement, or a futility analysis aimed at the wrong pleading.[95]

178. A pattern finding entered without identified predicates and without an identified enterprise is a conclusion without premises. ROA.2078-2095.

---

[95] ROA.1083–1087; ROA.1090–1092; ROA.2078–2095.

179. Because the RICO ruling rested on those legal substitutions, vacatur is required. The Court need not decide whether Yan ultimately proves enterprise, pattern, injury, or agreement. Those questions belong to the district court under the correct predicate and conspiracy standards. At minimum, the Rule 15 denial must be vacated because Doc. 210-1 had to be tested as the operative PFAC for futility, not dismissed by reference to defects attributed to the TAC. ROA.2078-2095.

F. The U.S. Bank dismissal cannot stand because the complaint pleaded notice, U.S. Bank's acknowledged conflict between controlling orders, and a subsequent ERISA-fund distribution—not a routine ministerial transaction (Issue 16 and sub-issues 16(a)–16(c)).

180. The cleanest U.S. Bank theory is ERISA's statutory segregation duty. Section 1056(d)(3)(H)(i) provides that during any period in which the issue whether a domestic-relations order is qualified is being determined, the plan administrator must separately account for the amounts that would be payable if the order were qualified. That duty is mandatory and procedural; it does not depend on the administrator's ultimate view of the merits.

181. The Plan documents say the same thing. Appendix C, Section 2.1 provides: "During any period when the issue of whether a domestic relations order is a qualified domestic relations order is being determined by the Committee, the Committee shall cause the Plan to separately account for the amounts which would be payable to the Alternate Payee during such period if the order were determined to

110

be a qualified domestic relations order." ROA.1962. Under *Kennedy*, U.S. Bank was required to follow the Plan documents. Its Plan documents required separate accounting during a qualification dispute. U.S. Bank acknowledged a direct conflict between the controlling orders. It then distributed without applying that separate-accounting process. The Plan provision, the conflict letter, and § 1056(d)(3)(H)(i) are the pleaded fiduciary-process facts the district court said were missing.

182.  U.S. Bank's own writing triggered that duty. The complaint alleged, and the record cited, U.S. Bank's August 1 acknowledgment that the May 26 order appeared "in direct conflict" with the April 13 order. A direct conflict between the controlling orders means qualified status was unresolved. At that point, § 1056(d)(3)(H)(i) required segregation and withholding while qualification was determined. U.S. Bank did not segregate; it distributed. ROA.2034-2035.

183.  Nor was the § 1056(d)(3)(H)(i) theory forfeited. The TAC expressly pleaded § 1056(d)(3)(H)(i) as a primary ERISA contravention, incorporated the U.S. Code allegations into the U.S. Bank count, alleged U.S. Bank's direct-conflict admission, alleged multiple objections with evidence, and alleged failure to determine QDRO status before distribution. ROA.1129-1132. Yan then responded to U.S. Bank's motion with the same preservation point: U.S. Bank's duty concerned the QDRO determination, the July 21 objection stated that the proposed garnishment was not a

QDRO, the August 1 acknowledgment recognized a direct conflict, and §

1056(d)(3)(H)(i) and the Plan's QDRO procedures required a proper determination

before distribution. ROA.2019-2023. He later preserved the ERISA/QDRO theory

in post-remand reconsideration and objections.[96] U.S. Bank itself acknowledged that

the complaint alleged a breach under § 1056(d)(3)(H)(i), and its reply argued waiver

only because Yan supposedly offered no argument in opposition. ROA.1769-1770;

ROA.2074. But Doc. 148 did not rest on a pure waiver rule; it stated that Yan

"appeals to certain fund-sequestration statutes," including § 1056(d)(3)(H)(i), and

dismissed because the pleadings supposedly lacked facts showing a fiduciary

violation. ROA.2094-2095. That premise conflicts with the pleaded and attached

conflict-acknowledgment sequence. ROA.2034-2035.

184. U.S. Bank invoked *Kennedy* to argue that the face of the Domestic Relations

Order qualified under the Plan and that plan-document conformity foreclosed

fiduciary-breach liability; Doc. 148 accepted the Plan Document Rule as an

alternative reason. ROA.2074–2075; ROA.2095. The Plan Document Rule under

*Kennedy*[97] does not insulate U.S. Bank here. *Kennedy* holds that fiduciaries are not

liable if they act "in conformity with the plan documents."[98] But that defense

---

[96] ROA.2387-2390; ROA.2394; ROA.3021.
[97] *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009).
[98] *Id.* at 300.

assumes conformity with ERISA and the Plan's QDRO procedure, including a completed qualification determination. It does not permit distribution where the pleaded facts allege that the May 26 order did not qualify because the ultimate attorney-fee recipients were not alternate payees under § 1056(d)(3)(K), and because U.S. Bank's own conflict acknowledgment showed that qualification remained unresolved. ROA.1067–1068; ROA.1076; ROA.2034–2035. A plan administrator cannot invoke *Kennedy*'s conformity defense while simultaneously acknowledging a direct conflict between operative orders and then releasing funds without the segregation/accounting process § 1056(d)(3)(H)(i) requires. *Kennedy* protects distribution after a completed, unchallenged plan-document determination; it does not protect distribution after acknowledged conflict.

185. U.S. Bank's alternate-payee argument also misread the statute. Section 1056(d)(3)(H)(i) governs what the plan administrator must do while qualification is being determined; the duty is triggered by a disputed domestic-relations order and runs to the plan-administration process, not only to the person ultimately selected as alternate payee. Once U.S. Bank acknowledged a direct conflict between orders, the statutory segregation/accounting duty applied before final distribution, regardless of whether Yan was the named alternate payee. ROA.2034-2035; ROA.2094-2095.

186. That statutory theory is independent of the harder § 1983 fallback. U.S. Bank may argue it was only processing a court order, but ERISA made it the plan-side decisionmaker responsible for the QDRO determination and segregation procedure. Ministerial processing cannot excuse failure to follow the mandatory statutory process after written conflict notice. ROA.2034-2035.

187. The RICO and § 1983 theories against U.S. Bank should therefore be treated as alternative routes, not the center of the U.S. Bank appeal. The central point is that the complaint pleaded notice, conflict, a qualification question, and distribution without segregation. That states a plausible ERISA statutory-process claim and requires vacatur. ROA.2034-2035; ROA.2078-2095.

188. The same misreading controlled the "single, discrete and otherwise lawful" ruling. Doc. 148 stated that "a release of spousal support funds is not a RICO violation" and relied on the Fifth Circuit's "single, discrete and otherwise lawful" transaction language. ROA.2094. But the complaint pleaded a multi-step notice-and-distribution sequence: Yan objected, U.S. Bank acknowledged that the May 26 order appeared "in direct conflict" with the April 13 order, and distribution followed anyway. ROA.2034-2035. A court could not deem the transaction "otherwise lawful" or ordinary support administration at Rule 12 without first resolving the pleaded

ERISA qualification, segregation, and conflict-notice allegations under §
1056(d)(3)(H)(i).

III. <u>The sanctions ruling and pre-filing injunction must be vacated, and remand
should be assigned to a different judge.</u>

189. Section III addresses two additional errors that independently require relief.
First, the pre-filing injunction and related sanctions ruling cannot stand because the
court treated an arguable Rule 11 position and review-preserving § 636 objections
as sanctionable conduct, and imposed a filing restriction without the notice and
hearing *Qureshi* requires. Second, if the case is remanded, reassignment is warranted
to ensure genuinely fresh consideration and preserve the appearance of justice.
ROA.1667-1674; ROA.3023-3057.

A. The pre-filing injunction and related sanctions must be vacated because the court
treated permissible filings as abuse and imposed a *sua sponte* litigation restriction
without the process *Qureshi* requires (Issues 17–18 and sub-issues 17(a)–17(b))

190. The sanctions and pre-filing injunction fail under the clean *Qureshi* mismatch.
The only prior warning concerned future frivolous sanctions motions. Yan filed no
later sanctions motion before the injunction issued. The injunction instead rested on
different conduct: objections, reconsideration efforts, and issue-preserving filings.
ROA.1643-1650; ROA.1667-1674.

191. *Qureshi v. United States*[99] requires notice and an opportunity to be heard before a pre-filing injunction. Notice of one possible sanction for one category of future conduct is not notice that the court may impose a broader lifetime access restriction based on different filings. The mismatch alone requires vacatur.

192. The § 636 objections were also protected litigation conduct. A party must file specific objections to preserve Article III review and appellate issues. Treating those objections as abusive because they were detailed or because they challenged the FCR's premise converts the statutory review mechanism into the basis for punishment. ROA.3023-3057.

193. The Rule 11 safe-harbor point is secondary. Re-filing a Rule 11 motion after the 21-day safe-harbor period is not inherently frivolous when the challenged conduct remains uncorrected. But the Court need not reach every Rule 11 detail because the pre-filing injunction independently lacked *Qureshi* notice and rested on protected review-preserving conduct. ROA.1643-1650; ROA.1667-1674.

194. The access restriction should therefore be vacated.

---

[99] *Qureshi v. United States*, 600 F.3d 523, 525–26 (5th Cir. 2010).

B. Reassignment is required under *In re Corrugated Container Antitrust Litig.* because the post-recusal reassignment did not produce the de novo Article III review § 636(b)(1) requires, and fresh review would impose no meaningful duplication cost. (Issue 19).

195. Under *In re Corrugated Container Antitrust Litig.,* [100] Yan requests reassignment to a different Article III district judge and, if any magistrate referral is made, to a different magistrate judge.

196. The first *Corrugated Container* factor is satisfied because the case would otherwise return to the same adoption path that already produced final judgment without de novo engagement with Yan's specific § 636(b)(1) objections. The problem is not merely an adverse ruling; it is adoption without objection-specific analysis after a recusal and remand. ROA.2993; ROA.3023-3057; ROA.3064.

197. The second factor is satisfied because fresh review is necessary to preserve the appearance of justice. The earlier orders recast the ERISA-protected 401(k) as "certain funds under his control," described the case through a domestic-relations lens, relied on substituted RICO and antitrust theories, and cited *McKinley* for a judicial-immunity proposition it does not contain. A reasonable observer could

---

[100] *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 970 (5th Cir. 1980).

question whether remand to the same path would produce the first independent Article III review of Yan's objections.[101]

198.  The third factor favors reassignment because duplication costs are minimal. No trial occurred, no discovery record was managed to completion, and no independent merits analysis exists to duplicate. The remand task is legal: review the pleadings, PFAC, objections, sanctions order, and record exhibits under the correct frame. ROA.3064-3065.

## Conclusion

199.  This Court should vacate the dismissal judgment, vacate the amendment denials, vacate the sanctions and pre-filing injunction, and remand for fresh review of the ERISA-centered federal claims and defendant-specific theories. Any one of these errors requires vacatur. Together, they show something more fundamental: no court has yet evaluated the complaint on its own terms, under the correct legal standards, against the correct defendants, and on adversarially presented grounds.[102]

---

[101] ROA.1682; ROA.2078-2095; ROA.2082; ROA.2981-2992; ROA.3064.
[102] ROA.2078-2095; ROA.2981-2992; ROA.3064-3065.

200.   Remand should be to a different Article III district judge and, if referred, to a different magistrate judge. Yan does not seek reversal of the dismissal of Tarrant County. ROA.3064-3065.

Respectfully submitted,

*/s/ Conghua Yan*
Conghua Yan
2140 E Southlake Blvd, Suite L-439
Southlake, Texas 76092
214-228-1886
arnold200@gmail.com
Plaintiff-Appellant, Pro Se

CERTIFICATE OF SERVICE

This is to certify that the foregoing document has been served in a manner in compliance with Rule 25(b) and (c) of the Fed. R. App. P., on June 5, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Conghua Yan*
Conghua Yan

CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

- this brief contains 22,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type requirements of Fed. R. App. P. 32(a)(6) because:

- this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2016 Word with a 14-point font named Times New Roman.

Dated: February 5, 2026

*/s/ Conghua Yan*

Conghua Yan

## APPELLANT'S APPENDIX

Tab Document

A. Federal Public Law and Statutes (1–22)

B. Texas Statutes and Disciplinary Rule (23–26)